IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ANSON MARKWELL, as Trustee for the AMARK INVESTMENT TRUST | § § § | |
| v. | § § | |
| EQUITYBUILD, INC. D/B/A EB EQUITYBUILD CAPITAL, INC.; HARD MONEY COMPANY, LLC D/B/A VENTURE HARD MONEY CAPITAL, LLC; EQUITYBUILD FINANCE, LLC; JERRY H. COHEN; SHAUN D. COHEN; SSDF4 6250 S. MOZART, LLC; SSDF4 638 N AVERS, LLC; SSDF4 701 5TH, LLC; SSDF4 7024 S. PAXTON, LLC; SSDF4 7255 S. ELUCID, LLC; SSDF5 PORTFOLIO 1, LLC; SSDF7 PORTFOLIO 1, LLC; 4533-37 S. CALUMET, LLC; 6437 S. KENWOOD, LLC; 7026 CORNELL, INC.; 7109 S. CALUMET, LLC; 8100 S. ESSEX, LLC; EB SOUTH CHICAGO 4, LLC; AND SSPH PORTFOLIO 1, LLC | § § § § § § § § § § § § § § § § § § § § | Case No. 4:18-cv-01274 |

PLAINTIFF'S FIRST AMENDED COMPLAINT

TO THE HONORABLE CHIEF UNITED STATES DISTRICT JUDGE LEE H. ROSENTHAL:

NOW COMES Plaintiff Anson Markwell, as Trustee for the AMark Investment Trust (collectively, "AMark"), complaining of Defendants EquityBuild, Inc. d/b/a EB EquityBuild Capital, Inc.; Hard Money Company, LLC d/b/a Venture Hard Money Capital, LLC; EquityBuild Finance, LLC; Jerry H. Cohen; Shaun D. Cohen; SSDF4 6250 S. Mozart, LLC; SSDF4 638 N Avers, LLC; SSDF4 701 5TH, LLC; SSDF4 7024 S. Paxton, LLC; SSDF4 7255 S. Elucid, LLC; SSDF5 Portfolio 1, LLC; SSDF7 Portfolio 1, LLC; 4533-37 S. Calumet, LLC; 6437 S. Kenwood, LLC; 7026 Cornell, Inc.; 7026 S. Calumet, LLC; 8100 S. Essex, LLC; EB South Chicago 4, LLC;

and SSPH Portfolio 1, LLC, and files this First Amended Complaint (the "Complaint"), and in support thereof would respectfully show the Court the following:

## I. PARTIES

1.    Defendant EquityBuild, Inc. d/b/a EB EquityBuild Capital, Inc. ("EB Capital") is a Florida corporation that engages in business within the State of Texas. EB Capital has already made an appearance in this lawsuit.

2.    Defendant Hard Money Company, LLC d/b/a Venture Hard Money Capital, LLC ("Hard Money") is a Delaware limited liability company that engages in business within the State of Texas. Hard Money has already made an appearance in this lawsuit.

3.    Defendant EquityBuild Finance, LLC ("EB Finance") is a Delaware limited liability company that engages in business within the State of Texas. EB Finance has already made an appearance in this lawsuit.

4.    Defendant Jerry H. Cohen is a resident of the State of Florida who engages in business within the State of Texas. Jerry H. Cohen has already made an appearance in this lawsuit.

5.    Defendant Shaun D. Cohen is a resident of the State of New York who engages in business within the State of Texas. Shaun D. Cohen has already made an appearance in this lawsuit.

6.    Defendant SSDF4 6250 S. Mozart, LLC is an Illinois limited liability company that does not maintain an agent for service of process, and this lawsuit arises from its conduct as a sham entity and alter ego of EB Capital, which engaged in business within the State of Texas. Therefore, SSDF4 6250 S. Mozart, LLC may be served by serving the Texas Secretary of State as agent for this nonresident pursuant to Texas Civil Practice and Remedies Code Section 17.044. Service upon the Texas Secretary of State of duplicate copies of this Complaint and citation directed to SSDF4 6250 S. Mozart, LLC shall be made personally or by the United States mail, certified, return receipt

requested, to the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701.  The Texas Secretary of State shall immediately cause one of the copies thereof of both this Complaint and citation to be forwarded by United States mail, certified, return receipt requested, to SSDF4 6250 S. Mozart, LLC's registered agent for service of process in Illinois, Ioana Salajanu, at 321 N. Clark Street, Suite 2200, Chicago, Illinois 60654. Service upon the Secretary of State shall be returnable in not less than thirty (30) days.

7.      Defendant SSDF4 638 N Avers, LLC is an Illinois limited liability company that does not maintain an agent for service of process, and this lawsuit arises from its conduct as a sham entity and alter ego of EB Capital, which engaged in business within the State of Texas. Therefore, SSDF4 638 N Avers, LLC may be served by serving the Texas Secretary of State as agent for this nonresident pursuant to Texas Civil Practice and Remedies Code Section 17.044. Service upon the Texas Secretary of State of duplicate copies of this Complaint and citation directed to SSDF4 638 N Avers, LLC shall be made personally or by the United States mail, certified, return receipt requested, to the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701.  The Texas Secretary of State shall immediately cause one of the copies thereof of both this Complaint and citation to be forwarded by United States mail, certified, return receipt requested, to SSDF4 638 N Avers, LLC's registered agent for service of process in Illinois, Ioana Salajanu, at 321 N. Clark Street, Suite 2200, Chicago, Illinois 60654. Service upon the Secretary of State shall be returnable in not less than thirty (30) days.

8.      Defendant SSDF4 701 5TH, LLC is an Illinois limited liability company that does not maintain an agent for service of process, and this lawsuit arises from its conduct as a sham entity and alter ego of EB Capital, which engaged in business within the State of Texas. Therefore, SSDF4 701 5TH, LLC may be served by serving the Texas Secretary of State as agent for this

nonresident pursuant to Texas Civil Practice and Remedies Code Section 17.044. Service upon the Texas Secretary of State of duplicate copies of this Complaint and citation directed to SSDF4 701 5TH, LLC shall be made personally or by the United States mail, certified, return receipt requested, to the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701.  The Texas Secretary of State shall immediately cause one of the copies thereof of both this Complaint and citation to be forwarded by United States mail, certified, return receipt requested, to SSDF4 701 5TH, LLC's registered agent for service of process in Illinois, Ioana Salajanu, at 321 N. Clark Street, Suite 2200, Chicago, Illinois 60654. Service upon the Secretary of State shall be returnable in not less than thirty (30) days.

9.      Defendant SSDF4 7024 S. Paxton, LLC is an Illinois limited liability company that does not maintain an agent for service of process, and this lawsuit arises from its conduct as a sham entity and alter ego of EB Capital, which engaged in business within the State of Texas. Therefore, SSDF4 7024 S. Paxton, LLC may be served by serving the Texas Secretary of State as agent for this nonresident pursuant to Texas Civil Practice and Remedies Code Section 17.044. Service upon the Texas Secretary of State of duplicate copies of this Complaint and citation directed to SSDF4 7024 S. Paxton, LLC shall be made personally or by the United States mail, certified, return receipt requested, to the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701.  The Texas Secretary of State shall immediately cause one of the copies thereof of both this Complaint and citation to be forwarded by United States mail, certified, return receipt requested, to SSDF4 7024 S. Paxton, LLC's registered agent for service of process in Illinois, Ioana Salajanu, at 321 N. Clark Street, Suite 2200, Chicago, Illinois 60654. Service upon the Secretary of State shall be returnable in not less than thirty (30) days.

10.     Defendant SSDF4 7255 S. Elucid, LLC is an Illinois limited liability company that does not maintain an agent for service of process, and this lawsuit arises from its conduct as a sham entity and alter ego of EB Capital, which engaged in business within the State of Texas. Therefore, SSDF4 7255 S. Elucid, LLC may be served by serving the Texas Secretary of State as agent for this nonresident pursuant to Texas Civil Practice and Remedies Code Section 17.044. Service upon the Texas Secretary of State of duplicate copies of this Complaint and citation directed to SSDF4 7255 S. Elucid, LLC shall be made personally or by the United States mail, certified, return receipt requested, to the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701.  The Texas Secretary of State shall immediately cause one of the copies thereof of both this Complaint and citation to be forwarded by United States mail, certified, return receipt requested, to SSDF4 7255 S. Elucid, LLC's registered agent for service of process in Illinois, Ioana Salajanu, at 321 N. Clark Street, Suite 2200, Chicago, Illinois 60654. Service upon the Secretary of State shall be returnable in not less than thirty (30) days.

11.     Defendant SSDF5 Portfolio 1, LLC is an Illinois limited liability company that does not maintain an agent for service of process, and this lawsuit arises from its conduct as a sham entity and alter ego of EB Capital, which engaged in business within the State of Texas. Therefore, SSDF5 Portfolio 1, LLC may be served by serving the Texas Secretary of State as agent for this nonresident pursuant to Texas Civil Practice and Remedies Code Section 17.044. Service upon the Texas Secretary of State of duplicate copies of this Complaint and citation directed to SSDF5 Portfolio 1, LLC shall be made personally or by the United States mail, certified, return receipt requested, to the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701.  The Texas Secretary of State shall immediately cause one of the copies thereof of both this Complaint and citation to be forwarded by United States mail, certified, return receipt requested, to SSDF5

Portfolio 1, LLC's registered agent for service of process in Illinois, Ioana Salajanu, at 321 N. Clark Street, Suite 2200, Chicago, Illinois 60654. Service upon the Secretary of State shall be returnable in not less than thirty (30) days.

12.    Defendant SSDF7 Portfolio 1, LLC is an Illinois limited liability company that does not maintain an agent for service of process, and this lawsuit arises from its conduct as a sham entity and alter ego of EB Capital, which engaged in business within the State of Texas. Therefore, SSDF7 Portfolio 1, LLC may be served by serving the Texas Secretary of State as agent for this nonresident pursuant to Texas Civil Practice and Remedies Code Section 17.044. Service upon the Texas Secretary of State of duplicate copies of this Complaint and citation directed to SSDF7 Portfolio 1, LLC shall be made personally or by the United States mail, certified, return receipt requested, to the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701.  The Texas Secretary of State shall immediately cause one of the copies thereof of both this Complaint and citation to be forwarded by United States mail, certified, return receipt requested, to SSDF7 Portfolio 1, LLC's registered agent for service of process in Illinois, Ioana Salajanu, at 321 N. Clark Street, Suite 2200, Chicago, Illinois 60654. Service upon the Secretary of State shall be returnable in not less than thirty (30) days.

13.    Defendant 4533-37 S. Calumet, LLC is an Illinois limited liability company that does not maintain an agent for service of process, and this lawsuit arises from its conduct as a sham entity and alter ego of EB Capital, which engaged in business within the State of Texas. Therefore, 4533-37 S. Calumet, LLC may be served by serving the Texas Secretary of State as agent for this nonresident pursuant to Texas Civil Practice and Remedies Code Section 17.044. Service upon the Texas Secretary of State of duplicate copies of this Complaint and citation directed to 4533-37 S. Calumet, LLC shall be made personally or by the United States mail, certified, return receipt

requested, to the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701. The Texas Secretary of State shall immediately cause one of the copies thereof of both this Complaint and citation to be forwarded by United States mail, certified, return receipt requested, to 4533-37 S. Calumet, LLC's registered agent for service of process in Illinois, Ioana Salajanu, at 321 N. Clark Street, Suite 2200, Chicago, Illinois 60654. Service upon the Secretary of State shall be returnable in not less than thirty (30) days.

14.     Defendant 6437 S. Kenwood, LLC is an Illinois limited liability company that does not maintain an agent for service of process, and this lawsuit arises from its conduct as a sham entity and alter ego of EB Capital, which engaged in business within the State of Texas. Therefore, 6437 S. Kenwood, LLC may be served by serving the Texas Secretary of State as agent for this nonresident pursuant to Texas Civil Practice and Remedies Code Section 17.044. Service upon the Texas Secretary of State of duplicate copies of this Complaint and citation directed to 6437 S. Kenwood, LLC shall be made personally or by the United States mail, certified, return receipt requested, to the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701. The Texas Secretary of State shall immediately cause one of the copies thereof of both this Complaint and citation to be forwarded by United States mail, certified, return receipt requested, to 6437 S. Kenwood, LLC's registered agent for service of process in Illinois, Ioana Salajanu, at 321 N. Clark Street, Suite 2200, Chicago, Illinois 60654. Service upon the Secretary of State shall be returnable in not less than thirty (30) days.

15.     Defendant 7026 Cornell, Inc. is an Illinois limited liability company that does not maintain an agent for service of process, and this lawsuit arises from its conduct as a sham entity and alter ego of EB Capital, which engaged in business within the State of Texas. Therefore, 7026 Cornell, Inc. may be served by serving the Texas Secretary of State as agent for this nonresident

pursuant to Texas Civil Practice and Remedies Code Section 17.044. Service upon the Texas Secretary of State of duplicate copies of this Complaint and citation directed to 7026 Cornell, Inc. shall be made personally or by the United States mail, certified, return receipt requested, to the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701. The Texas Secretary of State shall immediately cause one of the copies thereof of both this Complaint and citation to be forwarded by United States mail, certified, return receipt requested, to 7026 Cornell, Inc.'s registered agent for service of process in Illinois, Ioana Salajanu, at 321 N. Clark Street, Suite 2200, Chicago, Illinois 60654. Service upon the Secretary of State shall be returnable in not less than thirty (30) days.

16.     Defendant 7109 S. Calumet, LLC is an Illinois limited liability company that does not maintain an agent for service of process, and this lawsuit arises from its conduct as a sham entity and alter ego of EB Capital, which engaged in business within the State of Texas. Therefore, 7109 S. Calumet, LLC may be served by serving the Texas Secretary of State as agent for this nonresident pursuant to Texas Civil Practice and Remedies Code Section 17.044. Service upon the Texas Secretary of State of duplicate copies of this Complaint and citation directed to 7109 S. Calumet, LLC shall be made personally or by the United States mail, certified, return receipt requested, to the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701. The Texas Secretary of State shall immediately cause one of the copies thereof of both this Complaint and citation to be forwarded by United States mail, certified, return receipt requested, to 7109 S. Calumet, LLC's registered agent for service of process in Illinois, Ioana Salajanu, at 321 N. Clark Street, Suite 2200, Chicago, Illinois 60654. Service upon the Secretary of State shall be returnable in not less than thirty (30) days.

17.     Defendant 8100 S. Essex, LLC is an Illinois limited liability company that does not maintain an agent for service of process, and this lawsuit arises from its conduct as a sham entity and alter ego of EB Capital, which engaged in business within the State of Texas. Therefore, 8100 S. Essex, LLC may be served by serving the Texas Secretary of State as agent for this nonresident pursuant to Texas Civil Practice and Remedies Code Section 17.044. Service upon the Texas Secretary of State of duplicate copies of this Complaint and citation directed to 8100 S. Essex, LLC shall be made personally or by the United States mail, certified, return receipt requested, to the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701.  The Texas Secretary of State shall immediately cause one of the copies thereof of both this Complaint and citation to be forwarded by United States mail, certified, return receipt requested, to 8100 S. Essex, LLC's registered agent for service of process in Illinois, Ioana Salajanu, at 321 N. Clark Street, Suite 2200, Chicago, Illinois 60654. Service upon the Secretary of State shall be returnable in not less than thirty (30) days.

18.     Defendant EB South Chicago 4, LLC is a Delaware limited liability company that does not maintain an agent for service of process, and this lawsuit arises from its conduct as a sham entity and alter ego of EB Capital, which engaged in business within the State of Texas. Therefore, EB South Chicago 4, LLC may be served by serving the Texas Secretary of State as agent for this nonresident pursuant to Texas Civil Practice and Remedies Code Section 17.044. Service upon the Texas Secretary of State of duplicate copies of this Complaint and citation directed to EB South Chicago 4, LLC shall be made personally or by the United States mail, certified, return receipt requested, to the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701.  The Texas Secretary of State shall immediately cause one of the copies thereof of both this Complaint and citation to be forwarded by United States mail, certified, return receipt requested, to EB South

Chicago 4, LLC's registered agent for service of process in Delaware, Corporate Creations Network, Inc., at 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, Delaware 19810. Service upon the Secretary of State shall be returnable in not less than thirty (30) days.

19.      Defendant SSPH Portfolio 1, LLC is an Illinois limited liability company that does not maintain an agent for service of process, and this lawsuit arises from its conduct as a sham entity and alter ego of EB Capital, which engaged in business within the State of Texas. Therefore, SSPH Portfolio 1, LLC may be served by serving the Texas Secretary of State as agent for this nonresident pursuant to Texas Civil Practice and Remedies Code Section 17.044. Service upon the Texas Secretary of State of duplicate copies of this Complaint and citation directed to SSPH Portfolio 1, LLC shall be made personally or by the United States mail, certified, return receipt requested, to the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701.  The Texas Secretary of State shall immediately cause one of the copies thereof of both this Complaint and citation to be forwarded by United States mail, certified, return receipt requested, to SSPH Portfolio 1, LLC's registered agent for service of process in Illinois, Ioana Salajanu, at 321 N. Clark Street, Suite 2200, Chicago, Illinois 60654. Service upon the Secretary of State shall be returnable in not less than thirty (30) days.

## II.  JURISDICTION AND VENUE

20.      This Court has jurisdiction over this dispute because there is complete diversity of citizenship between the parties and the alleged amount in controversy exceeds $75,000, exclusive of interest and costs. 28 U.S.C. § 1332(a).

21.      Venue is mandatory in Harris County because this suit is an action for the recovery of an interest in real property that is located in Harris County, Texas and because the transactions that form the basis of this lawsuit surround real property situated in Harris County, Texas and a

substantial portion of the acts or omissions that gave rise to AMark's claims occurred in Harris County, Texas.

### III.  FACTUAL BACKGROUND

22.     This lawsuit surrounds the misappropriation of loaned funds by a father (Jerry H. Cohen) and son (Shaun D. Cohen), who together devised a fraudulent scheme using numerous companies that they created and operated in conjunction with each other to pool lenders together, use the numerous pools' loaned funds to finance the purchase and alleged renovation of real property, and to sell the property without paying the secured lenders, all in order for Jerry H. Cohen and Shaun D. Cohen to profit financially.

23.     AMark was a lender in this scheme, and this lawsuit surrounds two separate, but related, transactions involving EB Capital, Hard Money, EB Finance, Jerry H. Cohen, and Shaun D. Cohen (collectively, the "Original Defendants"), as well as the fraudulent transfer of numerous real property tracts owned by EB Capital to other entities that are sham entities that are owned, upon information and belief, in whole or in part, by Jerry H. Cohen and Shaun D. Cohen.

#### 1102 BINGHAM STREET, HOUSTON, TEXAS 77007 (THE "HOUSTON PROPERTY")

24.     In this transaction, Hard Money pooled money together from other lenders, then acted as servicer and agent of a loan from the lenders (including AMark) to EB Capital. EB Capital used the loan proceeds to acquire the Houston Property, and in exchange, executed a promissory note to Hard Money, as servicer and agent for all lenders (including AMark), which was secured by a Deed of Trust to the Houston Property.

25.     On March 20, 2014, AMark and Hard Money mutually executed a Collateral Agency and Servicing Agreement (the "Houston Servicing Agreement"), a true and correct copy of which is attached hereto and incorporated herein for all purposes as Exhibit "A." As a result of

the resulting agent-principal relationship, Hard Money owed AMark fiduciary duties as AMark's (and all lenders') agent to act solely in the best interest of AMark, as well as fulfill all duties and obligations as AMark's agent and fiduciary with regard to the Houston Property.

26.     Pursuant to the terms of the Houston Servicing Agreement, AMark loaned the sum of $125,000.00 to be used as part of the funds that would finance the purchase of the Houston Property.

27.     On April 1, 2014, EB Capital and Hard Money executed a promissory note (the "Houston Promissory Note") in the amount of $1,663,053.00, a true and correct copy of which is attached hereto and incorporated herein for all purposes as Exhibit "B."

28.     Pursuant to the terms of the Houston Promissory Note, Hard Money pooled AMark's loaned funds with $1,538,053.00 in additional funds from other lenders and loaned EB Capital the amount of $1,663,053.00, which EB Capital purported to use to purchase the Houston Property and develop the Houston Property pursuant to the "EquityBuild Flipping Model."

29.     Specifically, according to closing statements obtained from the Original Defendants, the contracted purchase price for the Houston Property was $1,325,000.00 (although according to Harris County tax records, the Houston Property only had a fair market value of $452,546.00 at the time of AMark's loan) and the Original Defendants' purchase of the Houston Property, and in an email dated March 18, 2014, Shaun D. Cohen represented that the remaining funds from the pooled loans, approximately $338,053.00, would be dedicated to pay Hard Money's fees and to the cost of subdividing the land, re-platting it, and drafting architectural designs for a newly-constructed 18-unit townhome development.

30.     As discussed in more detail below, the Original Defendants never had the ability or intention to complete the development of this 18-unit townhome development.

31.      The same day, April 1, 2014, EB Capital executed a deed of trust covering the
Houston Property (the "Houston Deed of Trust") in favor of Hard Money, as servicer and agent
for all lenders (including AMark), securing repayment of the Houston Promissory Note. A true
and correct copy of the Houston Deed of Trust is attached hereto and incorporated herein and
incorporated herein for all purposes as Exhibit "C."

32.      The Houston Deed of Trust also included the following cross-collateralization
provision:

> This Deed of Trust shall secure, in addition to the [Houston
> Promissory] Note, all funds hereafter advanced by Beneficiary to or
> for the benefit of Grantor, as contemplated by any covenant or
> provision herein contained or for any other purpose, and all other
> indebtedness, of whatever kind or character, owing or which may
> hereafter become owing by Grantor to Beneficiary, whether such
> indebtedness is evidenced by note, open account, overdraft,
> endorsement, surety agreement, guaranty or otherwise, it being
> contemplated that Grantor may hereafter become indebted to
> Beneficiary in further sum or sums.

33.      The Houston Promissory Note's original maturity date was November 21, 2014.[1]

### 5201-5207 W. WASHINGTON BLVD. CHICAGO, ILLINOIS 60644 (THE "CHICAGO PROPERTY")

34.      In this transaction, EB Finance pooled money together from other lenders, then
acted as servicer and agent of a loan from the lenders (including AMark) to EB Capital. EB Capital
purported to use the loan proceeds to acquire the Chicago Property and improve the Chicago
Property with substantial renovations throughout the building and individual units. In exchange,
EB Capital executed a promissory note to EB Finance, as servicer and agent for the lenders
(including AMark), which was secured by a mortgage on the Chicago Property.

---

[1] Shaun D. Cohen subsequently "extended" the maturity date of both the Houston Promissory Note and the Chicago
Promissory Note without the consent, and in fact against the direct instructions, of AMark and other lenders.

35.     On January 27, 2015, AMark and EB Finance mutually executed a Collateral Agency and Servicing Agreement (the "Chicago Servicing Agreement"), a true and correct copy of which is attached hereto and incorporated herein for all purposes as Exhibit "D." As a result of the resulting agent-principal relationship, EB Finance owed AMark fiduciary duties as AMark's (and all lenders') agent to act solely in the best interest of AMark, as well as fulfill all duties and obligations as AMark's agent and fiduciary with regard to the Chicago Property.

36.     Pursuant to the terms of the Chicago Servicing Agreement, AMark loaned the sum of $367,500.00, alongside a 2-point incentive in the amount of $7,500.00, for a total loan of $375,000.00 to be used as part of the funds that would finance the purchase and alleged planned renovation of the Chicago Property.

37.     On January 30, 2015, EB Capital and EB Finance executed a promissory note (the "Chicago Promissory Note") in the amount of $2,200,000.00, a true and correct copy of which is attached hereto and incorporated herein for all purposes as Exhibit "E."

38.     Pursuant to the terms of the Chicago Promissory Note, EB Finance pooled AMark's loaned funds with $1,825,000.00 in additional funds from other lenders and loaned EB Capital the amount of $2,200,000.00, which EB Capital purported to use to purchase and renovate the Chicago Property with the following six-phase construction plan:

1.      Permit;

2.      Demo;

3.      Rough-In;

4.      Dry Wall;

5.      Finish Out; and

6.    Punch List.[2]

39.    Specifically, according to information from the PTAX-203 Real Estate Transfer Declaration obtained from the Cook County Recorder of Deeds and the Illinois Department of Revenue, the full actual consideration (sales price) reported to the State of Illinois for the purchase of the Chicago Property by the Original Defendants was $1,150,000.00, and in an email dated January 15, 2015, Shaun D. Cohen represented that the remaining funds from the pooled loans, approximately $1,050,000.00, would be dedicated to pay EB Finance's fees and to the cost of the following renovations pursuant to the "EquityBuild Flipping Model:"

> The building features 24 one-bed/one-bath units, 11 two-bed/one-bath units and 3 studio apartments which will all be rehabbed with new kitchens, bathrooms, floors and paint, allowing for substantial rent increases.

40.    As discussed in more detail below, the Original Defendants never had the ability or intention to complete these renovations.

41.    On January 30, 2015, EB Capital executed a mortgage security instrument for the Chicago Property (the "Chicago Security Instrument") in favor of EB Finance, as servicer and agent for the lenders, securing repayment of the Chicago Promissory Note. A true and correct copy of the Chicago Security Instrument is attached hereto and incorporated herein for all purposes as Exhibit "F."

42.    The Chicago Note's original maturity date was February 1, 2017.

---

[2] This six-phase construction plan was provided by EB Capital in an email, signed by "EquityBuild team" dated February 18, 2015, in which EB Capital further represented that "As each of the six phases is completed, you will receive an update much like this, including pictures, project status, timeline and schedule completion tracking. You will always be 'in the know' of what to expect next." This statement, like many others from EB Capital and the other Original Defendants, was completely untrue. In the "Common-Law & Statutory Fraud" sections (Counts 1 through 4) of this Complaint, AMark has listed the broad categories of fraud committed by the Original Defendants because the individual fraudulent misrepresentations were too numerous to practically re-list, and those sections incorporate these factual allegations by reference in their entirety. However, in the interest of adhering to the principles of fair-notice pleading, AMark contends that this misrepresentation constitutes a separate and distinct instance of fraud.

ORIGINAL DEFENDANTS' DEFAULT, FRAUDULENT CONDUCT, & BREACH OF FIDUCIARY DUTY

43.     Shortly after the maturity of the Chicago Note, AMark began acquiring information regarding the Original Defendants' operations beyond the Houston Property and the Chicago Property. Following months of inquiry by AMark, it became clear that the Original Defendants never had any intention of repaying the funds obtained from AMark and instead are merely operating a fraudulent scheme designed to misappropriate funds from lenders.

44.     EB Capital, Hard Money, and EB Finance are all ultimately wholly owned, either directly or indirectly though other wholly owned entities, by Jerry H. Cohen,[3] and in operating these entities, Jerry H. Cohen and Shaun D. Cohen engaged in a substantial amount of self-dealing, as a well as an apparent comingling of funds, and have misappropriated a substantial amount of funds for their own benefit.

45.     These transactions began with an email from Shaun D. Cohen on September 10, 2013—before either of the loans had occurred—personally assuring AMark that when it loans money to EB Capital, AMark "will always be in first mortgage position throughout the life of the note and have a qualified borrower in a strong equity position."

46.     In that same email, Shaun D. Cohen represented that his father, Jerry H. Cohen, was essentially a preeminent real estate guru that has experienced nothing but success in the market, stating:

---

[3] *See* Docket #10 admitting this fact.

Jerry is a professional real estate investor and has been active in the real estate investment industry since 1984. By 1989, Jerry became one of the largest residential real estate investors in the mid-Atlantic. Through the years, while actively building and maintaining his portfolio, friends and family sought him out for advice and help in building their own portfolios. This happened often enough that Shaun (Jerry's son) approached Jerry with the idea of bringing his vast experience to the market place and help others build wealth through real estate. Between the two, they have successfully completed well over 1500 transactions.

47.    Likewise, throughout various other communications and marketing materials, Jerry H. Cohen and Shaun D. Cohen repeatedly represented the loan returns to be "guaranteed" and continuously reassured EB Capital's potential lenders that "EquityBuild has never defaulted on a loan and has zero foreclosures on 600+ deals closed!"[4]

48.    Other specific misrepresentations made specifically by Shaun D. Cohen to induce AMark to loan funds to the Original Defendants include, but are not limited to:

**Does [EB Capital] Offer A Guarantee?** Yes! Because [EB Capital] controls every aspect of the real estate transaction the company is willing to take on a burden of proof. [EB Capital] has 3 guarantees for the real estate property investor which also translates into further protections for the real estate note investor.

1) The rent guarantee will subsidize the difference between collected rents and the note payments due so that the borrower is never under water. There is a variation of this for cash buyers as well.[5]

2) The maintenance guarantee stands for a year and shows that the [EB Capital] team stands behind our rehabs.[6]

3) The loss guarantee also stands for a year and shows that the [EB Capital] team stands behind its valuation.[7]

---

[4] Two examples of this representation occurred in two emails from Shaun D. Cohen dated January 4, 2015 and January 15, 2015, respectively.
[5] AMark contends that this misrepresentation constitutes a separate and distinct instance of fraud.
[6] AMark contends that this misrepresentation constitutes a separate and distinct instance of fraud.
[7] Shaun D. Cohen made this verbatim misrepresentation by email dated September 10, 2013. AMark contends that this misrepresentation constitutes a separate and distinct instance of fraud.

. . . .

All real estate note investors receive a 12% annualized return and the lending structure is that of direct lending between themselves and one of [EB Capital's] real estate investors, not participation in mortgage pools. Direct lending, while not as fluid as mortgage pools, provides much greater security for the real estate note investor since he/she has a security instrument in their name or in their entity's name. This will allow them to be in a 1st lien position should there be a default. However, because of the manner in which [EB Capital] controls the real estate side, none of [EB Finance's] real estate note investors have suffered a default.[8]

. . . .

GUARANTEED 15% PLUS ROI on our high-end new construction project in Houston, TX![9]

. . . .

Note holders have first lien position.[10]

. . . .

EquityBuild Finance private mortgage notes are 100% backed by real estate.[11]

. . . .

Our notes are always 100% backed by real estate, and this one is backed by a fully operational, professionally managed 38-unit apartment building in an up and coming neighborhood in Chicago. All note holders are protected with first lien position.

The deal closes on January 22, and investment slots are filling quickly for this first private note opportunity in 2015. No volatility. No bubbles. No worrying about how this long bull market is winding

---

[8] Shaun D. Cohen made this verbatim misrepresentation by email dated September 10, 2013. AMark contends that this misrepresentation constitutes a separate and distinct instance of fraud.

[9] Shaun D. Cohen made this verbatim misrepresentation by email dated April 2, 2014. AMark contends that this misrepresentation constitutes a separate and distinct instance of fraud.

[10] Shaun D. Cohen made this verbatim misrepresentation by email dated January 4, 2015. AMark contends that this misrepresentation constitutes a separate and distinct instance of fraud.

[11] Shaun D. Cohen made this verbatim misrepresentation by email dated January 4, 2015. AMark contends that this misrepresentation constitutes a separate and distinct instance of fraud.

down. Just a steady stream of totally passive income paid to you
monthly for the next two years.[12]

49.     Utilizing these misrepresentations, Original Defendants then took AMark's funds, and executed contractual documents—the Houston Servicing Agreement and the Chicago Servicing Agreement—expressly providing that AMark's deed of trust/mortgage on each the Houston Property and the Chicago Property could only be released with its written consent and upon full payment of all sums secured by the security instruments.

50.     Throughout the life of each the Houston Promissory Note and the Chicago Promissory Note, the Original Defendants then sent numerous communications alleging that improvements were being made to the properties and that they were being readied for profitable sales and huge recoveries for the benefit of each EB Capital, AMark, and all other lenders.

51.     Nevertheless, Shaun D. Cohen, on behalf of Hard Money and EB Finance, repeatedly attempted to extend the maturity date of both the Houston Promissory Note and the Chicago Promissory Note without AMark's approval, and in fact against AMark's express direction, which violates both the terms of the Houston Servicing Agreement and the terms of the Chicago Servicing Agreement.[13]

52.     For example, for the Houston Property, the Original Defendants repeatedly approached AMark and the other lenders with false promises of various deals that were always just on the verge of being finalized in an attempt to improperly induce AMark to extend the term of its loan or release its lien on the Houston Property.

---

[12] Shaun D. Cohen made this verbatim misrepresentation by email dated January 15, 2015. AMark contends that this misrepresentation constitutes a separate and distinct instance of fraud.
[13] It is worth noting that, in addition to being the President of Hard Money and EB Finance, Shaun D. Cohen is also the Vice President of EB Capital.

53.     Specifically, on at least four separate occasions (by correspondence dated May 18, 2015;[14] December 11-20, 2015;[15] August 16, 2016;[16] and October 25, 2016,[17] respectively), the Original Defendants affirmatively represented that there were developers ready to develop the Houston Property, either with EB Capital as a joint venture or on their own after acquiring the Houston Property.

54.     Likewise, on at least seven other separate occasions (by correspondence dated June 12, 2018;[18] August 4, 2015;[19] January 2, 2016;[20] February 26, 2016;[21] March 31, 2016;[22] May 23, 2016;[23] and June 24, 2016,[24] respectively) the Original Defendants affirmatively represented that there were purchasers preparing offers to purchase the Houston Property.

---

[14] On May 18, 2015, John Allred, EB Capital's Chief Client Advocate, represented by email that there were two developers that were "both [] about to begin construction and more formal updates will be sent once they do." Based upon information and belief, John Allred is employed by both EB Capital and EB Finance, further evidencing the blatant self-dealing involved in the transactions between these two entities.

[15] On December 11-20, 2015, Joel Feingold, EB Capital's Real Estate Consultant, represented by email that a joint venture was being pursued to develop the Houston Property. Based upon information and belief, Joel Feingold is employed by both EB Capital and EB Finance, further evidencing the blatant self-dealing involved in the transactions between these two entities.

[16] On August 16, 2016, John Allred represented by email that EB Capital was in contact with a new developer that was interested in developing the Houston Property.

[17] On October 25, 2016, Ronald Bol, EB Capital's Chief Operating Officer, represented by email that EB Capital was in contact with yet another new developer that had the blueprints for the Houston Property and was interested in developing the Houston Property.

[18] On July 12, 2015, Dishan Newton, EB Capital's Asset Manager, forwarded an email update from Jerry H. Cohen and Shaun D. Cohn stating, "there was an offer to buy the land recently and *we are under contract to sell it*. If this happen(s) you will all be paid back according to the note terms."

[19] On August 4, 2015, Shaun D. Cohen represented by email that EB Capital has "secured a buyer" for the Houston Property and that the transaction was set to close on August 7, 2015.

[20] On January 2, 2016, John Allred represented by email that a builder was interested in buying the Houston Property and was currently doing its due diligence.

[21] On February 26, 2016, John Allred represented by email that there were three separate parties evaluating the Houston Property for potential purchase.

[22] On March 31, 2016, John Allred forwarded an email report to Jerry H. Cohen stating that an investment group was very interested in purchasing the Houston Property and that the investment group only needs a few weeks to do its due diligence.

[23] On May 23, 2016, John Allred represented by email that EB Capital was expecting an offer to purchase the Houston Property from an investment group the within the next week and that the investment group could close in 30 days or less with cash.

[24] On June 24, 2016, John Allred forwarded an e-mail stating EB Capital was "currently in negotiations with the first (investment) group after having received a LOI from them… which could lead to a closing around the end of July."

55.     Similarly, on at least two other separate occasions (by correspondence dated June 19, 2017,[25] and October 19, 2017,[26] respectively) the Original Defendants affirmatively represented that there were equity funds (which were also to be controlled by the Original Defendants) ready to buy-out the lenders' individual loan rights for the Houston Property.

56.     Unsurprisingly, none of these alleged transactions were ever consummated. AMark rejected each of the Original Defendants' attempts to fraudulently obtain its consent to extend the terms of its loan on the Houston Property, but nevertheless, Shaun D. Cohen has unilaterally extended the terms of AMark's loan against its express direction on numerous occasions.

57.     The Houston Promissory Note and Chicago Promissory Note both matured, AMark was not repaid, and the vast majority of both notes remains outstanding.[27]

58.     On January 1, 2018, unknown to AMark and without consent, Original Defendants prepared and filed a Release Deed, signed by Shaun D. Cohen, that released AMark's Chicago Security Instrument without notice to, or consent from, AMark. A true and correct copy of the Release Deed obtained from the Cook County Recorder of Deeds is attached hereto and incorporated herein for all purposes as Exhibit "G."

59.     On November 28, 2017, Original Defendants executed a Warranty Deed, which was signed by Jerry H. Cohen and filed on January 2, 2018, that transferred the Chicago Property to a third-party without repaying AMark its loaned funds. A true and correct copy of the Warranty

---

[25] On June 19, 2017, Brian Walker, EB Capital's Director of Operations, represented by text message that "we have finally arrived at a point where we have a clear vision for your exit and return of capital . . . this is not only a viable project but that the expected return will meet or exceed the goals of our soon to be launched all Equity Fund . . . . The appetite for this product among accredited investors thus far is insatiable and so it's with confidence that I can say that within the next 120 days, your lender positions will be fully bought out."

[26] On October 19, 2017, John Allred represented by email that the Houston Property "is still in process to be sold to an equity fund structure of our making, but it may be year end on closing."

[27] As this matter escalated by virtue of AMark's refusal to consent to extend the loan terms, on or about April 3, 2017, the Original Defendants paid AMark $75,000.00 of the loaned funds on the Chicago Property but have failed and refused to repay any further funds or the promised interest. The last interest payment that AMark received for either the Houston Promissory Note or the Chicago Promissory Note that was received on February 24, 2018.

Deed obtained from the Cook County Recorder of Deeds is attached hereto and incorporated herein for all purposes as Exhibit "H."

60.      On January 31, 2018, Anson Markwell had a telephone conversation with Shaun D. Cohen, in which Shaun D. Cohen did not disclose that AMark's Chicago Security Instrument had been fraudulently released and that the Chicago Property had already been sold. Rather, Shaun D. Cohen indicated at that point that there were some problems with the Chicago Property that would require it to be sold at pennies on the dollar and asked Anson Markwell to release AMark's Chicago Security Instrument so that it could be sold.

61.      After this conversation, Original Defendants continued to attempt to mislead AMark into believing that it still had the Chicago Security Instrument, issuing a business-as-usual Lender Statement of Account on February 2, 2018. A true and correct copy of the February 2, 2018 Lender Statement of Account is attached hereto and incorporated herein for all purposes as Exhibit "I."

62.      Likewise, also on February 2, 2018, Shaun D. Cohen coordinated the preparation and transmission to AMark of an Amended and Restated Unsecured Promissory Note for each property, which were both offered by Shaun D. Cohen to replace each the Houston Promissory Note and the Chicago Promissory Note.[28] True and correct copies of these proposed Amended and Restated Unsecured Promissory Notes for each the Houston Promissory Note and the Chicago Promissory Note (the "Proposed Houston Unsecured Note" and the "Proposed Chicago Unsecured

---

[28] After some negotiation and expressed reservation from AMark, Shaun D. Cohen agreed to restructure the Houston Promissory Note such that it would still be secured by the Houston Property. As a result, the Proposed Houston Unsecured Note attached as Exhibit J hereto actually contains a security provision allowing the Houston Property to remain as collateral for the repayment of the loaned funds. However, it was originally proposed as unsecured and no mutually-acceptable terms for a restructured loan, whether secured or unsecured, were ever reached.

Note" respectively) are attached hereto and incorporated herein for all purposes as Exhibits "J"

and "K" respectively.

       63.    Moreover, the first paragraph of the Proposed Chicago Unsecured Note confirmed

the misrepresentations made previously by Shaun D. Cohen, that the Chicago Promissory Note

was still secured by the Chicago Property, stating:

> This Amended and Restated Unsecured Promissory Note (this "Note") amends, restates, replaces and supersedes in all respects that certain secured Promissory Note (the "Prior Note") dated January 3rd, 2015 between Borrower and Lender that was secured by that certain piece of real property located at 5201-5207 W. Washington Blvd., Chicago, IL 60644 (the "Property") pursuant to a real property mortgage filed in the real property records (the "Prior Mortgage"). Lender acknowledges and has consented (and by execution hereof, evidences such consent) to (i) the termination of the Prior Mortgage, (ii) the elimination of a security interest in favor of the Lender on the Property pursuant to the Prior Mortgage, and (iii) the amending, restating, replacing and superseding of the Prior Note pursuant to this Note in the amount set forth below as the Principal Amount upon the refinancing of the Property ***with a new senior secured lender who will have a first priority secured position in the Property. The parties acknowledge that the Property is not securing this Note, as it did the Prior Note. The Borrower was unable to pay the Prior Note as it came due and, in lieu of foreclosure procedures on the Property and the risk that the foreclosure process would yield less proceeds to Lender in respect of the outstanding balance on the Prior Note,[29] Lender has consented to the refinancing of the Property with a new senior secured lender whereby the new senior secured lender acquires a security interest in the Property and, where such new senior secured lender will not allow any additional collateral security interest to be granted in the Property***, the Lender retains an unsecured obligation from Borrower as evidenced by this Note. (emphasis added).

---

[29] Based upon information and belief, these proposed unsecured promissory notes were cookie-cutter documents used on numerous occasions for other properties. Although it references refinancing, it was intended that a purchaser would be subsequently purchasing the Chicago Property. It is unclear to date who did the underlying analysis to support the numerous conclusions contained in this paragraph regarding the various consequences if the Proposed Chicago Unsecured Note was not signed and upon what information these conclusions were based.

64.     However, by February 2, 2018, AMark had already discovered the Release Deed and Warranty Deed through public record filings, and knew that the statements made by Shaun D. Cohen and Jerry H. Cohen, both in prior conversations and in the Proposed Chicago Unsecured Note, were false. The Chicago Property was not facing foreclosure, there was no refinancing lender, AMark's Chicago Security Instrument had already been fraudulently released, and the Chicago Property had already been sold. AMark accordingly declined to execute any releases or unsecured promissory notes to ratify the Original Defendants' fraudulent conduct in violation of EB Finance's fiduciary duty owed to AMark, instead demanding immediate repayment, as well as an accounting of the sales proceeds for the Chicago Property.

65.     On February 15, 2018, AMark was finally forced to involve legal counsel and informed Shaun D. Cohen that it would pursue legal action if its funds were not repaid.

66.     Apparently prompted by AMark's communication, on February 16, 2018, the Original Defendants finally notified several of their other lenders (except for AMark) for the first time that they had sold the Chicago Property—albeit omitting that it had already been sold for 80 days without any notice to any of the lenders.

67.     By two emails to AMark, both dated February 28, 2018, Shaun D. Cohen stated that the sales price for the Chicago Property was negotiated as part of a bulk sale of properties, that there was no document showing what portion of the sales price was allotted for the Chicago Property, that he was unaware of anyone making such an allocation, and that he did not know what such allocation price would be. This, likewise, constitutes another admitted violation of EB Finance's fiduciary duty owed to AMark, as well as gross negligence and willful and malicious injury to AMark and its collateral interest in the Chicago Property arising from the Chicago Security Instrument.

68.     Shaun D. Cohen's release of the Chicago Security Instrument was conducted without any prior knowledge or approval by AMark, which is required pursuant to the terms of the Chicago Servicing Agreement. Moreover, Shaun D. Cohen's actions allowed him and his father to abscond with no less than AMark's portion of the purchase price without repaying the underlying debts owed. AMark therefore alleges that this conduct further constitutes gross negligence and willful misconduct with respect to the underlying collateral.

69.     Likewise, the terms of the sale itself evidence breaches of fiduciary duty. EB Capital sold the property, without notice to AMark, as part of a bulk sale with several other properties owned by EB Capital. Shaun D. Cohen's contention that the price was negotiated as a whole and that he is plainly unaware of what portion of the sale price was allotted for the Chicago Property in itself constitutes a breach of fiduciary duty.[30] In essence, Shaun D. Cohen contends that, as servicer, he executed a release of the Chicago Security Instrument, without paying the lenders or providing them notice, and allowed the property to be sold by EB Capital, of which he is also the Vice President, without any knowledge of the price for which the Chicago Property sold.

70.     The Original Defendants have not been timely paying the property taxes for the Houston Property[31] or the Chicago Property[32] and clearly never had any intention to improve (or even properly maintain) either the Houston Property or the Chicago Property. In fact, AMark is not aware of any evidence of any improvement or development performed on either property.

---

[30] Shaun D. Cohen's various statements regarding the sales price of the Chicago Property have been inconsistent with each other and with public records reflecting the transaction.
[31] According to the Harris County Tax Assessor-Collector's 2017 Property Tax Statement, as of June 4, 2018, EB Capital owes more than $56,462.33 in delinquent 2016 and 2017 property taxes, including substantial penalties and interest, on the Houston Property.
[32] According to records reviewed from the Cook County Clerk's Office, EB Capital owed $12,047.97 in property taxes for the Chicago Property. The tax lien was actually sold, and based upon information and belief, the taxes were not paid until the purchaser of the Chicago Property paid them on December 26, 2017, as part of EB Capital and EB Finance's fraudulent sale of the Chicago Property.

71.     For example, despite numerous updates provided by the Original Defendants claiming that the Houston Property was making its way through the permitting and construction process, no development was ever performed on the Houston Property, and the Original Defendants' contention is that they will sell the Houston Property undeveloped.[33] Below is a photograph of the Houston Property taken on April 29, 2018, showing its still-undeveloped, dilapidated state:



72.     Additionally, below is another photograph taken on April 29, 2018, showing a dilapidated building on the Houston Property that has not been renovated or demolished:

---

[33] The Original Defendants made this contention for the first time by email dated December 16, 2014—just 33 days after sending an update that the Houston Promissory needed to be extended and that the Houston Property was a viable project for development.



73.    Finally, also on April 29, 2018, AMark discovered the following Violation Notice from the City of Houston's Department of Neighborhoods for failure to properly maintain the Houston Property, which they are purportedly attempting to market and sell:



74.    A title search of the Houston Property likewise revealed a Lien for Work and Improvements placed upon the Houston Property by the City of Houston on June 27, 2017 for the

following work performed by the city on to bring the Houston Property into compliance with city ordinances:

> . . . cleansing from filth, carrion, or other impure or unwholesome matter, the cutting and removal of weeds or brush, the filling of pools, and/or the removal of rubbish or other objectionable, unsightly or unsanitary matter . . . .

75.     As stated below, it is now clear that misappropriation of AMark's loaned funds was the Original Defendants' goal all along because they never had the ability, let alone the intention, to improve either the Houston Property or the Chicago Property. That stated, absent the apparent misappropriation of the funds by the Original Defendants, those funds, which were never spent on construction and renovation, should be readily available to be returned to AMark and the other lenders whose loans are secured by the Houston Property. With respect to the Chicago Property, AMark has specifically requested an accounting of the purchase price, and by email dated April 7, 2015, John Robins, EB Capital and EB Finance's Real Estate Consultant,[34] forwarded the following response EB Finance forwarded a response from Shaun D. Cohen:

> We do not typically share the purchase price. We don't share it because we don't want people focused on our profit. That profit covers many internal expenses that a too numerous to list and so the "profit" could be misunderstood.

76.     This response highlights Shaun D. Cohen's apparent viewpoint that the loaned funds not spent on the purchase of the Chicago Property were his "profit" that need not be disclosed.

77.     Moreover, it is now clear that the Original Defendants never had any intention to maintain AMark's position as a first-priority secured lender, and never had any intention to maintain EB Capital as a qualified borrower in a strong equity position.

---

[34] Based upon information and belief, John Robins is employed by both EB Capital and EB Finance, further evidencing the blatant self-dealing involved in the transactions between these two entities.

78.     Indeed, not even Jerry H. Cohen's investment history was as initially represented by Shaun D. Cohen, who failed to mention that in 1994—five years after allegedly becoming "one of the largest residential real estate investors in the mid-Atlantic," Jerry H. Cohen filed for Chapter 11 bankruptcy protection, which was subsequently converted to a Chapter 7 bankruptcy, and his assets were liquidated to discharge his numerous defaulted financial obligations.[35]

79.     Furthermore, Shaun D. Cohen had also himself filed for Chapter 7 bankruptcy, and his assets were liquidated to discharge more than $1 million in personal debt.[36]

80.     Based upon all of these facts and circumstances, AMark has reason to believe that its loaned funds have been misappropriated and fraudulently diverted for the personal benefit of Shaun D. Cohen and Jerry H. Cohen, and that Defendants are working in concert to leave AMark and other lenders as unsecured parties with promissory notes owed by a shell entity with no remaining assets.

81.     Unknown to AMark at the time it declined to sign the Proposed Houston Unsecured Note and Proposed Chicago Unsecured Note being offered by Shaun D. Cohen and Jerry H. Cohen, the notes would have been completely worthless because Defendants had already been actively transferring EB Capital's assets to other entities that they owned through intermediary holding companies, as set forth below, such that EB Capital would have no liquidity or other assets to pay these obligations.

82.     After all lawful offsets and credits to the Original Defendants' account, the amount of $631,855.64 remained due and owing as of March 1, 2018.

---

[35] Jerry H. Cohen's bankruptcy case was originally filed in the U.S. Bankruptcy Court for the Middle District of Florida, bearing Case No. 9:94-bk-09013-ALP, but was transferred to the U.S. Bankruptcy Court for the Eastern District of Pennsylvania, bearing Case No. 95-10573 due to his numerous failed real estate investments in Pennsylvania at the time.
[36] Shaun D. Cohen's bankruptcy case was filed in the U.S. Bankruptcy Court for the Middle District of Florida, bearing Case No. 9:10-bk-06615-ALP.

83.     All conditions precedent to AMark's recovery of judgment against all Defendants have occurred, been performed or been waived.

SUBSEQUENT FRAUDULENT TRANSFER OF ASSETS

84.     After filing the instant suit, AMark learned that the Original Defendants have been actively transferring their assets to the following additional entities (the "Transferee Entities"), which based on information and belief are wholly owned, through intermediary holding companies, by Jerry H. Cohen and Shaun D. Cohen.

a.     SSDF4 6250 S. Mozart, LLC;
b.     SSDF4 638 N Avers, LLC;
c.     SSDF4 701 5TH, LLC;
d.     SSDF4 7024 S. Paxton, LLC;
e.     SSDF4 7255 S. Elucid, LLC;
f.     SSDF5 Portfolio 1, LLC;
g.     SSDF7 Portfolio 1, LLC;
h.     4533-37 S. Calumet, LLC;
i.     6437 S. Kenwood, LLC;
j.     7026 Cornell, Inc.;
k.     7109 S. Calumet, LLC;
l.     8100 S. Essex, LLC;
m.     EB South Chicago 4, LLC; and
n.     SSPH Portfolio 1, LLC.

85.     Based upon information and belief, each of the Transferee entities are sham entities created to perpetrate a fraud because: (1) they share common employees with EB Capital; (2) they share common offices with EB Capital; (3) the Defendants collectively employ centralized accounting; (4) wages and expenses are all paid by EB Capital; (6) services rendered by employees of EB Capital are rendered on behalf of each of these entities; (7) there are undocumented transfers of funds between EB Capital and the entities; and (8) there is an unclear allocation of profits and losses between EB Capital and each of these entities.[37] Furthermore, based on Shaun D. Cohen's

---

[37] These factors are all set forth upon information and belief at this point. These individual factors will all be the subject of AMark's impending discovery requests, at which time AMark will be in a better position to make a more definitive statement regarding each individual factor.

inability to provide to AMark the alleged sale price of the unauthorized transfer of the Chicago Property, AMark would also allege, based upon information and belief, that the transferee did not pay to EB Capital reasonable equivalent value for these alleged property transfers.

86.     A chart containing the relevant facts surrounding these fraudulent transfers (the "Chart") is provided below:

## SUMMARY OF EB CAPITAL PROPERTY TRANSFERS

| A | B | C | D |
|---|---|---|---|
| **Deed Recording Date** | **Address of Property(ies) Transferred[38]** | **Transferee Entity Name** | **Mortgage Release Recording Date[39]** |
| 11/10/2015 | 7026 S. Cornell Ave. 7032 S. Cornell Ave. | 7026 Cornell Inc. | None |
| None[40] | 701 S. 5th Ave. | SSDF4 701 5th LLC | None |
| None | 638 N. Avers Ave. | SSDF4 638 N. Avers LLC | None |
| None | 7024 S. Paxton Ave. | SSDF4 7024 S. Paxton LLC | 5/1/2017 |
| 2/1/2017 | 4533 S. Calumet Ave. 4537 S. Calumet Ave. 4541 S. Calumet Ave. 4545 S. Calumet Ave. | 4533-37 S. Calamet LLC | None |
| 2/1/2017 | 7109 S. Calumet Ave. 7113 S. Calumet Ave. 7117 S. Calumet Ave. | 7109 S. Calumet LLC | None |
| 3/8/2017 | 8114 S. Essex Ave. | 8100 S Essex LLC | None |

---

[38] For purposes of brevity, a shortened version of the addresses of the transferred properties is provided in the Chart. However, each of the properties listed is located in Chicago Illinois, with the exception of the property located at 701 S. 5th Avenue, which is located in Maywood, Illinois 60153.

[39] All of the mortgages releases reflected in this Chart were executed by Shaun D. Cohen.

[40] As of the date of filing this First Amended Complaint, AMark has not been able to locate a recorded deed evidencing the transfers of the properties located at 701 S. 5th Ave., Maywood, IL 60153; 638 N. Avers Ave., Chicago, IL 60624; and 7024 S. Paxton Ave., Chicago, IL 60649. However, the Original Defendants have setup entities with the specific name of these properties, and it is their usual practice to transfer the property to such entity after its creation.

| | | | |
|---|---|---|---|
| 5/9/2017<br>5/12/2017 | 4750 S. Indiana Ave.<br>5618 S. Park Ave.<br>5620 S. Park Ave.<br>6554 S. Vernon Ave.<br>6558 S. Vernon Ave.<br>1422 E. 68th St.<br>2220 E. 75th St.<br>7840 S. Yates Blvd.<br>2800 E. 81st St. | SSPH Portfolio 1 LLC | None |
| 9/14/2017 | 8000 S. Justine St.<br>8214 S. Ingleside Ave.<br>8209 S. Ellis Ave. | EB South CHGO 4 LLC | None |
| 9/29/2017 | 7201 S. Constance Ave.<br>7625 S. East End Ave.<br>7635 S. East End Ave.<br>7752 S. Muskegon Ave.<br>3074 E. Cheltenham Pl. | SSDF5 Portfolio 1 LLC | 9/18/2017<br>9/13/2017 |
| 10/17/2017 | 6437 S. Kenwood Ave. | 6437 S. Kenwood LLC | None |
| 12/8/2017 | 2832 W. 63rd St. | SSDF4 6250 S. Mozart LLC | None |
| 12/8/2017 | 7255 S. Euclid Ave. | SSDF4 7255 S. Elucid LLC | None |
| 4/10/2018 | 7546 S. Saginaw Ave.<br>8354 S. Ellis Ave.<br>8343 S. Ellis Ave.<br>8336 S. Ellis Ave.<br>8326 S. Ellis Ave.<br>7442 S. Calumet Ave.<br>1401 E. 72nd St.<br>7051 S. Bennett Ave.<br>6355 S. Talman Ave.<br>6356 S. California Ave.<br>2736 W. 64th St.<br>4319 S. Michigan Ave.<br>820 E. Marquette Rd.<br>7508 S. Essex Ave.<br>7656 S. Kingston Ave.<br>7600 S. Kingston Ave.<br>7750 S. Essex Ave.<br>7701 S. Essex Ave.<br>7959 S. Marquette Ave.<br>8201 S. Kingston Ave. | SSDF7 Portfolio 1 LLC | 4/12/2018<br>4/26/2018 |

87.    Based upon information and belief, according to documents obtained from the Cook County Recorder of Deeds, on the deed date listed in Column A of the Chart, the Original

Defendants transferred or conveyed the corresponding property(ies) listed in Column B of the Chart to the corresponding entity listed in Column C of the Chart. In several cases, the mortgage issued by the Original Defendants was then released on the release date listed in Column D of the Chart. However, in other cases, no mortgage release was recorded and the property was simply transferred. For example, on December 8, 2017, the Original Defendants conveyed or transferred the real property located at 2832 W. 63rd Street, Chicago, Illinois 60629 to SSDF4 6250 S. Mozart, LLC, and no mortgage release was recorded.

88.     Based upon information and belief, many of the lenders that loaned money for the purchase of the conveyed properties by EB Capital are still unaware that the properties listed in Column B of the Chart were conveyed and are likewise unaware that their underlying mortgages were either extinguished and/or their collateral is now subject to a new mortgage, without their knowledge or approval.

### EB Capital's Default Under Unsecured Promissory Notes to Other Lenders

89.     Unsurprisingly, on June 1, 2018, EB Capital contacted several of the lenders that had converted their secured promissory notes to unsecured promissory notes from EB Capital,[41] stating that EB Capital could no longer afford to make the payments on the unsecured promissory notes.

90.     Instead, EB Capital informed the lenders that it would be swapping the lenders' worthless unsecured promissory notes for worthless equity in EB Capital itself—ostensibly changing nothing for them other than taking away the monthly debt payments they had been receiving, prohibiting them from declaring default on the notes for non-payment, and changing the type of notice they will receive when EB Capital inevitably files for no-asset Chapter 7 bankruptcy.

---

[41] Based upon information and belief, these other lenders executed unsecured promissory notes that are identical or substantially similar to the Proposed Chicago Unsecured Note.

91.     Although it is clear from the June 1, 2018 email, and even implied therein, that the email was written by Shaun D. Cohen and Jerry H. Cohen,[42] neither Shaun D. Cohen nor Jerry H. Cohen were willing to sign their name to the bottom of it, instead simply signing it "EquityBuild, Inc."

92.     As for the reasoning behind EB Capital's inability to repay the notes, the June 1, 2018 email tells a long, compelling story about the Original Defendants allegedly being defrauded by their prior construction contractor, G-Slow Construction Services, LLC ("G-Slow"), and trying against all odds to do right by their lenders:

> . . . . Some of you may have grown weary of the name G-Slow but that name is an important part of our history and their fraud was a defining event of our company's trajectory.
>
> G-Slow was chosen as our sole fulfillment partner in Chicago after much research and deliberation. In the early years, the relationship was a solid one with G-Slow being comprised of two partners, one of whom was one the country's most successful Re-Max agents and the other that had 46 years of construction management experience with a portfolio of over $800mm in managed projects across the country and for companies such as Sprint, WalMart, Home Depot, etc. Neither of these individuals was new to the fulfillment business and both came with a stellar track record.
>
> The relationship began at the end of 2011 and lasted for almost exactly three years. ***Towards the end of 2014 we began seeing contractor's liens appear on properties for which we had paid G-Slow for a renovation but for which they did not pay the contractor as evidenced by the liens.***[43] The fact that they weren't paying contractors was not discovered prior to the liens because each property was inspected by a professional that was under contract with us and G-Slow was filing waivers of liens for the work which turned out to be fraudulent. That was the beginning of the end of the relationship but also the beginning of a lengthy discovery process to determine the financial impact of all of the deceit. That discovery

---

[42] For example, the June 1, 2018 email states "When we began the concept behind this company in 2005 and then the company itself in 2006, we were a sales and marketing company specializing in turn-key investment properties."

[43] AMark contends that the Original Defendants' failure to disclose this alleged fact to AMark prior to AMark advancing funds for the purchase of the Houston Property and the Chicago Property constitutes a separate and distinct instance of fraud by omission.

process is still on-going and now totaling over $12mm. If you care to read the lawsuit you can click here. As a side note, since filing, we have not updated the amounts by which were damaged because they both filed for bankruptcy and there is nothing to recover.

*It was then, at the end of 2015, that we were faced with the question as to whether or not we should file for bankruptcy and just tell everyone we were sorry but that we couldn't handle the mountain that we needed to climb.*[44] We decided to persevere and committed ourselves to making our lenders whole by devoting the majority of our profits and shrinking the gap over time so that we could shield our clients and honor our original commitments to them.

93.     The June 1, 2018 email ultimately concludes that despite the valiant and selfless efforts put forth by the Original Defendants,[45] EB Capital simply could not overcome the unfortunate position that G-Slow put it in through G-Slow's alleged fraud and deceit.

94.     The link to the alleged lawsuit contained in the excerpt above is simply a broken link to a removed page from EB Capital's own website. However, the only lawsuit pending between EB Capital and G-Slow that AMark could locate made no mention of either the Houston Property or the Chicago Property, and to date, AMark has not been able to locate a pending bankruptcy for G-Slow. Although one of the principals of G-Slow has declared bankruptcy, the Original Defendants have not filed a proof of claim in that bankruptcy proceeding and otherwise have made no attempt to enforce its alleged rights against G-Slow in that proceeding. Accordingly,

---

[44] AMark contends that the Original Defendants' failure to disclose this alleged fact to AMark prior to AMark advancing funds for the purchase of the Houston Property and the Chicago Property constitutes a separate and distinct instance of fraud by omission.

[45] Amongst these efforts was Shaun Cohen's assurance on a June 9, 2015 phone call that he and his father, Jerry H. Cohen, are "committed to no one getting hurt," and that they would be siphoning off profit from other deals to ensure that the Houston Promissory Note would be fully repaid. In hindsight, this was perhaps the first indication of the Original Defendants' willingness to misappropriate loaned funds and use them to pay off other lenders. AMark contends that the Original Defendants' failure to disclose this siphoning plan to AMark prior to AMark advancing funds for the purchase of the Houston Property and the Chicago Property constitutes a separate and distinct instance of fraud by omission.

AMark believes that the G-Slow story is simply a fabrication in a continued attempt to cover up Defendants' concerted fraudulent conduct.

95.     However, to the extent that there is any truth to the story put forth by Shaun D. Cohen and Jerry H. Cohen in the June 1, 2018 email, AMark asserts that these facts, which were admittedly discovered by the Original Defendants at or before the execution of the Houston Promissory Note (and years before the execution of the Chicago Promissory Note), were improperly concealed and misrepresented to AMark at the time it advanced funds pursuant to both the Houston Promissory Note and the Chicago Promissory Note, constituting a separate and distinct instance of fraud and breach of fiduciary duty by the Original Defendants.[46]

96.     Furthermore, absent an improper misappropriation of loaned funds,[47] the prior fraud of EB Capital's construction contractor should have absolutely no impact on the loans for properties that were acquired ***after*** its relationship with G-Slow was allegedly terminated, and Shaun D. Cohen admitted that the Houston Property was never "in the tentacles of G-Slow," which, based upon information and belief, has never been EB Capital's vendor in Houston, Texas. Thus, to the extent that the Original Defendants claim that either of the loan transactions set forth herein were impacted by G-Slow's alleged conduct, AMark would assert that impact as a separate and distinct instance of misappropriation of funds, fraudulent misrepresentation, and breach of fiduciary duty by the Original Defendants.

---

[46] Not only have the Original Defendants repeatedly represented EB Capital to be fully financially stable and capable of fulfilling its obligations, they likewise represented that EB Capital had the capability to provide prompt development and renovations for the Houston Property and Chicago Property that EB Capital never had any ability to provide. Specifically, the June 1, 2018 email continued to state that "[f]ollowing the decision to press on, we were then faced with the reality that we had no fulfillment process and no fulfillment vendor yet still, we must continue on." This is plainly inconsistent with the numerous representations that "rapid renovations" would be performed at the Chicago Property, which were made by Shaun D. Cohen to AMark at the time that it advanced funds for the Chicago Property. AMark contends that this misrepresentation constitutes a separate and distinct instance of fraud.
[47] At no point did AMark agree to allow its loaned funds to be used to satisfy the Original Defendants' other debts or to fund any projects other than the two projects set forth herein.

97.     It is unclear at this point whether the Original Defendants contend that they unilaterally converted AMark's Chicago Promissory Note to worthless equity in EB Capital (although AMark was not a direct recipient of the June 1, 2018 email). However, on June 1, 2018, the Original Defendants sent AMark an updated Lender Statement of Account, which deleted the Chicago Promissory Note completely from AMark's account with no reference to why it was deleted (or even that it had ever existed and was deleted). A true and correct copy of the June 1, 2018 Lender Statement of Account is attached hereto and incorporated herein for all purposes as Exhibit "L."

98.     Meanwhile, Shaun D. Cohen has managed to upgrade from his Plano home valued at approximately $430,000, where he was served with process on March 26, 2018, to a $2.3 million luxury condominium in New York City—all while allegedly "climbing the mountain" and devoting the majority of his personal profits to repaying his lenders.[48]

99.     To date, EB Capital continues to advertise to additional lenders, and despite its alleged "pennies on the dollar" losses on the Chicago Property that EB Capital claims kept the Chicago Promissory Note from being repaid, still includes the following on its website:

> ***We guarantee that an EquityBuild property's value will never drop below the purchase price plus the costs of rehabilitation under standard market conditions.***[49]

### IV.  CAUSES OF ACTION

### COUNT 1: COMMON-LAW & STATUTORY FRAUD – EB CAPITAL

100.     AMark incorporates herein all prior and subsequent allegations in this pleading as though fully set forth herein.

---

[48] Based upon information and belief, Shaun D. Cohen still owns his home in Plano, Texas and has simply added the New York condominium to his personal assets.
[49] AMark contends that this misrepresentation constitutes a separate and distinct instance of fraud.

101.    EB Capital committed common-law fraud by making the following material misrepresentations to AMark, in addition to the numerous material misrepresentations as detailed throughout this Complaint:

a.    Affirmatively misrepresenting the status of EB Capital, Hard Money, EB Finance, and its principals as financially strong and savvy real estate investors, despite having knowledge of G-Slow's alleged misconduct and the prior bankruptcies of both Jerry H. Cohen and Shaun D. Cohen;

b.    Affirmatively misrepresenting EB Capital's plan to develop the Houston Property, when EB Capital had no intention or ability to do so;

c.    Affirmatively misrepresenting EB Capital's plan to renovate the Chicago Property, when EB Capital had no intention or ability to do so;

d.    Affirmatively misrepresenting that the Houston Property was in the process of being developed, when no such development was taking place;

e.    Affirmatively misrepresenting that the Chicago Property was in the process of being renovated, when no such renovations were taking place;

f.    Affirmatively misrepresenting that alleged buyers were interested in purchasing the Houston Property, when no such alleged buyers existed;

g.    Affirmatively misrepresenting that alleged developers were interested in developing the Houston Property, when no such alleged developers existed;

h.    Affirmatively misrepresenting that alleged equity funds were interested in buying out AMark's right to repayment under the Houston Promissory Note, when no such alleged equity funds existed; and

i.      Affirmatively misrepresenting that the Chicago Property was being prepared for sale, when the Release Deed and Warranty Deed had been executed and that the Chicago Property had been sold.

102.   EB Capital further committed common-law fraud by omission by concealing or failing to disclose the following material facts that (1) were within its knowledge, (2) it had a duty to disclose, (3) it knew that AMark did not know and did not have an equal opportunity to discover, (4) it intended to induce AMark to take some action by concealing or failing to disclose; (5) AMark relied upon; and (6) caused injury to AMark was injured as a result of acting without that knowledge:

a.      Failing to disclose, prior to AMark lending the funds at issue, that an issue with G-Slow was allegedly impacting the financial stability of EB Capital and allegedly threatening its future viability as a borrower for both the Houston Promissory Note and the Chicago Promissory Note;

b.      Failing to disclose that the City of Houston had placed a lien on the Houston Property, thereby degrading the value of the collateral securing AMark's right to repayment under the Houston Promissory Note;

c.      Failing to disclose that the property taxes for the Houston Property have not been paid, thereby causing additional fees and interest to accrue and further degrading the value of the collateral securing AMark's right to repayment under the Houston Promissory Note;

d.      Failing to disclose that the property taxes for the Chicago Property had not been paid, thereby causing additional fees and interest to accrue and further

degrading the value of the collateral securing AMark's right to repayment under the Chicago Promissory Note; and

e.   Failing to disclose that the Release Deed and Warranty Deed had been executed and that the Chicago Property had been sold.

103.   Additionally, the following actions or omissions constitute separate and distinct instances of fraud by EB Capital:

a.   Failing to use the funds loaned pursuant to the Houston Promissory Note exclusively for benefit of purchasing and developing the Houston Property, as was represented to AMark before the funds were advanced;

b.   Failing to use the funds loaned pursuant to the Chicago Promissory Note exclusively for benefit of purchasing and renovating the Chicago Property, as was represented to AMark before the funds were advanced;

c.   Failing to properly maintain the Houston Property in order to protect the collateral securing AMark's right to repayment under the Houston Promissory Note;

d.   Failing to properly maintain the Chicago Property in order to protect the collateral securing AMark's right to repayment under the Chicago Promissory Note;

e.   Selling the Chicago Property without notice to and the consent of AMark;

f.   Failing to maintain, preserve, and protect the Houston Property for the benefit of AMark and all other lenders; and

g.   Failing to maintain, preserve, and protect the Chicago Property for the benefit of AMark and all other lenders.

104.    These misrepresentations, actions, and omissions, as well as those that are detailed throughout this Complaint and incorporated herein by reference, were made with the intent to cause AMark to commit initially or thereafter not declare any payment default with regard to a substantial amount of loaned funds, which have been misused, diverted, or have otherwise disappeared, and AMark relied on EB Capital's misrepresentations and omissions to AMark's detriment.

105.    Furthermore, these misrepresentations and omissions constitute statutory fraud in a real estate transaction, as set forth in TEX. BUS. & COM. CODE § 27.01, because they were false representation of a past or existing material fact that were made to AMark for the purpose of inducing AMark to enter into the Houston Promissory Note and the Chicago Promissory Note, and AMark relied on these misrepresentations and omissions that person in entering into that contract.

106.    As a proximate result of EB Capital's fraudulent conduct, AMark has suffered damages in the form of economic loss and consequential damages  in an amount to be determined by the finder of fact but not to exceed $1,000,000.00 (excluding punitive damages and attorney's fees), for which AMark now seeks recovery from EB Capital.

107.    EB Capital's conduct, as set forth herein, was committed with fraud, actual malice and specific intent to harm AMark and constitutes gross negligence and willful and malicious injury to AMark and its collateral interest in the Houston Property arising from the Houston Deed of Trust, as well as its collateral interest in the Chicago Property arising from the Chicago Security Instrument.

108.    EB Capital's conduct was unjustified, likely to cause serious harm to AMark, and involved an extreme degree of risk considering the probability and magnitude of potential harm to AMark. EB Capital had subjective awareness of the risks involved, but nevertheless proceeded in

conscious indifference to the rights and welfare of AMark. As such, AMark seeks recovery of punitive damages from EB Capital.

### COUNT 2: COMMON-LAW & STATUTORY FRAUD – HARD MONEY

109.　AMark incorporates herein all prior and subsequent allegations in this pleading as though fully set forth herein.

110.　Hard Money committed common-law fraud by making the following material misrepresentations to AMark, in addition to the numerous material misrepresentations as detailed throughout this Complaint:

a.　Affirmatively misrepresenting the status of EB Capital, Hard Money, and their principals as financially strong and savvy real estate investors, despite having knowledge of G-Slow's alleged misconduct and the prior bankruptcies of both Jerry H. Cohen and Shaun D. Cohen;

b.　Affirmatively misrepresenting EB Capital's plan to develop the Houston Property, when EB Capital had no intention or ability to do so;

c.　Affirmatively misrepresenting that the Houston Property was in the process of being developed, when no such development was taking place;

d.　Affirmatively misrepresenting that alleged buyers were interested in purchasing the Houston Property, when no such alleged buyers existed;

e.　Affirmatively misrepresenting that alleged developers were interested in developing the Houston Property, when no such alleged developers existed;

f.　Affirmatively misrepresenting that alleged equity funds were interested in buying out AMark's right to repayment under the Houston Promissory Note, when no such alleged equity funds existed; and

g.      Affirmatively misrepresenting the financial status of EB Capital, which has actively been transferring all of its assets, in an attempt to fraudulently induce AMark to release its interest in the Houston Property and execute the Proposed Houston Unsecured Note.

111.    Hard Money further committed common-law fraud by omission by concealing or failing to disclose the following material facts that (1) were within its knowledge, (2) it had a duty to disclose, (3) it knew that AMark did not know and did not have an equal opportunity to discover, (4) it intended to induce AMark to take some action by concealing or failing to disclose; (5) AMark relied upon; and (6) caused injury to AMark was injured as a result of acting without that knowledge:

a.      Failing to disclose, prior to AMark lending the funds at issue, that Hard Money (agent and servicer for AMark for the Houston Promissory Note) is wholly owned by EB Capital (the borrower for the Houston Promissory Note);

b.      Failing to disclose, prior to AMark lending the funds at issue, that an issue with G-Slow was allegedly impacting the financial stability of EB Capital and allegedly threatening its future viability as a borrower for the Houston Promissory Note;

c.      Failing to disclose that the City of Houston had placed a lien on the Houston Property, thereby degrading the value of the collateral securing AMark's right to repayment under the Houston Promissory Note; and

d.      Failing to disclose that the property taxes for the Houston Property have not been paid, thereby causing additional fees and interest to accrue and further

degrading the value of the collateral securing AMark's right to repayment under the Houston Promissory Note.

112.    These misrepresentations and omissions, as well as those that are detailed throughout this Complaint and incorporated herein by reference, were made with the intent to cause AMark to commit initially or thereafter not declare any payment default with regard to a substantial amount of loaned funds, which have been misused, diverted, or have otherwise disappeared, and AMark relied on Hard Money's misrepresentations and omissions to AMark's detriment.

113.    Hard Money further committed common-law fraud by repeatedly fraudulently extending the term of the Houston Promissory Note without notice to AMark and against AMark's express direction to the contrary.

114.    Furthermore, these misrepresentations and omissions constitute statutory fraud in a real estate transaction, as set forth in TEX. BUS. & COM. CODE § 27.01, because they were false representation of a past or existing material fact that were made to AMark for the purpose of inducing AMark to enter into the Houston Promissory Note, and AMark relied on these misrepresentations and omissions that person in entering into that contract.

115.    As a proximate result of Hard Money's fraudulent conduct, AMark has suffered damages in the form of economic loss and consequential damages in an amount to be determined by the finder of fact but not to exceed $1,000,000.00 (excluding punitive damages and attorney's fees), for which AMark now seeks recovery from Hard Money.

116.    Hard Money's conduct, as set forth herein, was committed with fraud, actual malice and specific intent to harm AMark and constitutes gross negligence and willful and malicious

injury to AMark and its collateral interest in the Houston Property arising from the Houston Deed of Trust.

117.   Hard Money's conduct was unjustified, likely to cause serious harm to AMark, and involved an extreme degree of risk considering the probability and magnitude of potential harm to AMark. Hard Money had subjective awareness of the risks involved, but nevertheless proceeded in conscious indifference to the rights and welfare of AMark. As such, AMark seeks recovery of punitive damages from Hard Money.

### COUNT 3: COMMON-LAW & STATUTORY FRAUD – EB FINANCE

118.   AMark incorporates herein all prior and subsequent allegations in this pleading as though fully set forth herein.

119.   EB Finance committed common-law fraud by making the following material misrepresentations to AMark, in addition to the numerous material misrepresentations as detailed throughout this Complaint:

> a.   Affirmatively misrepresenting the status of EB Capital, EB Finance, and their principals as financially strong and savvy real estate investors, despite having knowledge of G-Slow's alleged misconduct and the prior bankruptcies of both Jerry H. Cohen and Shaun D. Cohen;
>
> b.   Affirmatively misrepresenting the EB Capital's plan to renovate the Chicago Property, when EB Capital had no intention or ability to do so;
>
> c.   Affirmatively misrepresenting that the Chicago Property was in the process of being renovated, when no such renovations were taking place;

    d.    Affirmatively misrepresenting that the Chicago Property was being prepared for sale, when the Release Deed and Warranty Deed had been executed and that the Chicago Property had been sold; and

    e.    Affirmatively misrepresenting the financial status of EB Capital, which has actively been transferring all of its assets, in an attempt to fraudulently induce AMark to release its interest in the Chicago Property and execute the Proposed Chicago Unsecured Note.

120.    EB Finance further committed common-law fraud by omission by concealing or failing to disclose the following material facts that (1) were within its knowledge, (2) it had a duty to disclose, (3) it knew that AMark did not know and did not have an equal opportunity to discover, (4) it intended to induce AMark to take some action by concealing or failing to disclose; (5) AMark relied upon; and (6) caused injury to AMark was injured as a result of acting without that knowledge:

    a.    Failing to disclose, prior to AMark lending the funds at issue, that EB Finance (agent and servicer for AMark for the Chicago Promissory Note) is wholly owned by EB Capital (the borrower for the Chicago Promissory Note);

    b.    Failing to disclose, prior to AMark lending the funds at issue, that an issue with G-Slow was allegedly impacting the financial stability of EB Capital and allegedly threatening its future viability as a borrower for the Chicago Promissory Note;

    c.    Failing to disclose that the property taxes for the Chicago Property had not been paid, thereby causing additional fees and interest to accrue and further

degrading the value of the collateral securing AMark's right to repayment under the Chicago Promissory Note; and

d.    Failing to disclose that the Release Deed and Warranty Deed had been executed and that the Chicago Property had been sold.

121.   These misrepresentations and omissions, as well as those that are detailed throughout this Complaint and incorporated herein by reference, were made with the intent to cause AMark to commit initially or thereafter not declare any payment default with regard to a substantial amount of loaned funds, which have been misused, diverted, or have otherwise disappeared, and AMark relied on EB Finance's misrepresentations and omissions to AMark's detriment.

122.   EB Finance further committed common-law fraud by repeatedly fraudulently extending the term of the Chicago Promissory Note and by fraudulently releasing the Chicago Security Instrument—both without notice to AMark and against AMark's express direction to the contrary.

123.   Furthermore, these misrepresentations and omissions constitute statutory fraud in a real estate transaction, as set forth in TEX. BUS. & COM. CODE § 27.01, because they were false representation of a past or existing material fact that were made to AMark for the purpose of inducing AMark to enter into the Chicago Promissory Note, and AMark relied on these misrepresentations and omissions that person in entering into that contract.

124.   As a proximate result of EB Finance's fraudulent conduct, AMark has suffered damages in the form of economic loss and consequential damages in an amount to be determined by the finder of fact but not to exceed $1,000,000.00 (excluding punitive damages and attorney's fees), for which AMark now seeks recovery from EB Finance.

125.    EB Finance's conduct, as set forth herein, was committed with fraud, actual malice and specific intent to harm AMark and constitutes gross negligence and willful and malicious injury to AMark and its collateral interest in the Chicago Property arising from the Chicago Security Instrument. EB Finance's conduct was unjustified, likely to cause serious harm to AMark, and involved an extreme degree of risk considering the probability and magnitude of potential harm to AMark. EB Finance had subjective awareness of the risks involved, but nevertheless proceeded in conscious indifference to the rights and welfare of AMark. As such, AMark seeks recovery of punitive damages from EB Finance.

**COUNT 4: COMMON-LAW & STATUTORY FRAUD – JERRY H. COHEN & SHAUN D. COHEN**

126.    AMark incorporates herein all prior and subsequent allegations in this pleading as though fully set forth herein.

127.    Jerry H. Cohen and Shaun D. Cohen committed common-law fraud by making, and directing others to make, the numerous material misrepresentations to AMark that are detailed throughout this First Amended Complaint and incorporated by reference herein. These misrepresentations and omissions were made with the intent to cause AMark to commit initially or thereafter not declare any payment default with regard to a substantial amount of loaned funds, which have been misused, diverted, or have otherwise disappeared, and AMark relied on Jerry H. Cohen and Shaun D. Cohen's misrepresentations and omissions to AMark's detriment.

128.    Additionally, Jerry H. Cohen, as the owner of EB Capital, Hard Money, and EB Finance, as well as an officer of EB Capital, and Shaun D. Cohen, as the corporate officer of EB Capital, Hard Money, and EB Finance, are both liable for each of the instances of fraud they committed on behalf of EB Capital, Hard Money, and EB Finance, as set forth in Counts 1, 2 and

3 above. The actions or omissions set forth therein were committed solely by, or at the direction of, both Jerry H. Cohen and Shaun D. Cohen, who each knowingly participated in the wrongdoing.

129.    Furthermore, these misrepresentations and omissions constitute statutory fraud in a real estate transaction, as set forth in TEX. BUS. & COM. CODE § 27.01, because they were false representation of a past or existing material fact that were made to AMark for the purpose of inducing AMark to enter into the Houston Promissory Note, the Houston Servicing Agreement, the Chicago Promissory Note, and the Chicago Servicing Agreement, and AMark relied on these misrepresentations and omissions that person in entering into that contract.

130.    As a result of Jerry H. Cohen and Shaun D. Cohen's fraudulent conduct, AMark has suffered damages in the form of economic loss and consequential damages in an amount to be determined by the finder of fact but not to exceed $1,000,000.00 (excluding punitive damages and attorney's fees), for which AMark now seeks recovery from Jerry H. Cohen and Shaun D. Cohen.

131.    Jerry H. Cohen and Shaun D. Cohen's conduct, as set forth herein, was committed with fraud, actual malice and specific intent to harm AMark. Jerry H. Cohen and Shaun D. Cohen's conduct was unjustified, likely to cause serious harm to AMark, and involved an extreme degree of risk considering the probability and magnitude of potential harm to AMark. Jerry H. Cohen and Shaun D. Cohen had subjective awareness of the risks involved, but nevertheless proceeded in conscious indifference to the rights and welfare of AMark. As such, AMark seeks recovery of punitive damages from Jerry H. Cohen and Shaun D. Cohen.

## COUNT 5: BREACH OF CONTRACT – EB CAPITAL

132.    AMark incorporates herein all prior and subsequent allegations in this pleading as though fully set forth herein.

133.    AMark is entitled to recover damages from EB Capital under a cause of action for breach of contract. The Houston Promissory Note and Chicago Promissory Note constitute valid and enforceable contracts between AMark and EB Capital, whereby AMark provided financing for the purchase of the Houston Property and the Chicago Property respectively. In return, EB Capital agreed to repay the loaned funds with interest, and in the process, EB Capital agreed to secure AMark's right to repayment with a collateral interest in the Houston Property and the Chicago Property respectively. Despite AMark's complete performance in advancing the required funds, EB Finance breached the Houston Promissory Note by:

a.      Failing to repay the loaned funds with interest;

b.      Failing to use the funds loaned pursuant to the Houston Promissory Note exclusively for benefit of purchasing and developing the Houston Property, as was represented to AMark before the funds were advanced;

c.      Failing to properly maintain the Houston Property in order to protect the collateral securing AMark's right to repayment under the Houston Promissory Note

d.      Failing to pay the property taxes for the Houston Property in order to protect the collateral securing AMark's right to repayment under the Houston Promissory Note;

e.      Failing to ensure that no other liens would be placed on the Houston Property in order to protect the collateral securing AMark's right to repayment under the Houston Promissory Note; and

f.      Failing to maintain, preserve, and protect the Houston Property for the benefit of AMark and all other lenders.

134.  Likewise, despite AMark's complete performance in advancing the required funds, EB Finance breached the Chicago Promissory Note by:

    a.    Failing to repay the loaned funds with interest;

    b.    Failing to use the funds loaned pursuant to the Chicago Promissory Note exclusively for benefit of purchasing and renovating the Chicago Property, as was represented to AMark before the funds were advanced;

    c.    Failing to properly maintain the Chicago Property in order to protect the collateral securing AMark's right to repayment under the Chicago Promissory Note;

    d.    Failing to pay the property taxes for the Chicago Property in order to protect the collateral securing AMark's right to repayment under the Chicago Promissory Note.

    e.    Failing to ensure that no other liens would be placed on the Chicago Property in order to protect the collateral securing AMark's right to repayment under the Chicago Promissory Note;

    f.    Selling the Chicago Property without notice to and the consent of AMark;

    g.    Failing to remit the proceeds from the sale of the Chicago Property to AMark in repayment of the Chicago Promissory Note;

    h.    Defaulting on its obligations under the Houston Promissory Note, which constitutes a separate and distinct instance of default under the Chicago Promissory Note; and

    i.    Failing to maintain, preserve, and protect the Chicago Property for the benefit of AMark and all other lenders.

135.     As a proximate result of EB Capital's breach of both contracts set forth herein, as well as those that are detailed in the Factual Background section of this Complaint and incorporated herein by reference, AMark has suffered damages in the form of economic loss and consequential damages in an amount to be determined by the finder of fact but not to exceed $1,000,000.00 (excluding punitive damages and attorney's fees), for which AMark now seeks recovery from EB Capital.

### COUNT 6: BREACH OF CONTRACT – HARD MONEY

136.     AMark incorporates herein all prior and subsequent allegations in this pleading as though fully set forth herein.

137.     AMark is entitled to recover damages from Hard Money under a cause of action for breach of contract. The Houston Servicing Agreement constitutes a valid and enforceable contract between AMark and Hard Money, whereby AMark delegated certain duties, responsibilities, and obligations related to the Houston Promissory Note, the Houston Deed of Trust, and the Houston Property to Hard Money in exchange for paying Hard Money substantial fees. Specifically, Hard Money agreed to act as AMark's agent in servicing the Houston Promissory Note, protecting AMark's collateral interest in the Houston Property, and ensuring that EB Capital repaid the Houston Promissory Note. Despite AMark's complete performance in advancing the required funds, Hard Money breached the Houston Servicing Agreement by:

    a.     Failing to ensure that EB Capital used the funds loaned pursuant to the Houston Promissory Note exclusively for benefit of purchasing and developing the Houston Property, as was represented to AMark before the funds were advanced;

b.      Failing to ensure that EB Capital properly maintained the Houston Property in order to protect the collateral securing AMark's right to repayment under the Houston Promissory Note;

c.      Failing to ensure that no other liens would be placed on the Houston Property in order to protect the collateral securing AMark's right to repayment under the Houston Promissory Note;

d.      Failing to ensure that the property taxes for the Houston Property would be paid in order to protect the collateral securing AMark's right to repayment under the Houston Promissory Note;

e.      Unilaterally extending the term of the Houston Promissory Note without notice to and the consent of AMark;

f.      Failing to declare EB Capital in default when EB Capital failed to timely make the payments due and owing under the under the Houston Promissory Note in accordance with its terms and pursuant to the express direction of AMark;

g.      Failing to foreclose on the Houston Property when EB Capital failed to timely make the payments due and owing under the under the Houston Promissory Note in accordance with its terms and pursuant to the express direction of AMark; and

h.      Failing to require EB Capital to maintain, preserve, and protect the Houston Property for the benefit of AMark and all other lenders.

138.    As a proximate result of Hard Money's breach as set forth herein, as well as those breaches that are detailed in the Factual Background section of this Complaint and incorporated

herein by reference, AMark has suffered damages in the form of economic loss and consequential damages in an amount to be determined by the finder of fact but not to exceed $1,000,000.00 (excluding punitive damages and attorney's fees), for which AMark now seeks recovery from Hard Money.

## COUNT 7: BREACH OF CONTRACT – EB FINANCE

139.     AMark incorporates herein all prior and subsequent allegations in this pleading as though fully set forth herein.

140.     AMark is entitled to recover damages from EB Finance under a cause of action for breach of contract. The Chicago Servicing Agreement constitutes a valid and enforceable contract between AMark and EB Finance, whereby AMark delegated certain duties, responsibilities, and obligations related to the Chicago Promissory Note, the Chicago Security Instrument, and the Chicago Property to EB Finance in exchange for paying EB Finance substantial fees. Specifically, EB Finance agreed to act as AMark's agent in servicing the Chicago Promissory Note, protecting AMark's collateral interest in the Houston Property, and ensuring that EB Capital repaid the Chicago Promissory Note. Despite AMark's complete performance in advancing the required funds, EB Finance breached the Houston Servicing Agreement by:

> a.     Failing to ensure that EB Capital used the funds loaned pursuant to the Chicago Promissory Note exclusively for benefit of purchasing and renovating the Chicago Property, as was represented to AMark before the funds were advanced;

> b.     Unilaterally extending the term of the Chicago Promissory Note without notice to and the consent of AMark;

c.  Failing to declare EB Capital in default when EB Capital failed to timely make the payments due and owing under the under the Chicago Promissory Note in accordance with its terms and pursuant to the express direction of AMark;

d.  Failing to foreclose on the Chicago Property when EB Capital failed to timely make the payments due and owing under the under the Chicago Promissory Note in accordance with its terms and pursuant to the express direction of AMark;

e.  Failing to ensure that no other liens would be placed on the Chicago Property in order to protect the collateral securing AMark's right to repayment under the Chicago Promissory Note;

f.  Failing to ensure that the property taxes for the Chicago Property would be paid in order to protect the collateral securing AMark's right to repayment under the Chicago Promissory Note;

g.  Unilaterally releasing the Chicago Security Interest without notice to and the consent of AMark, leaving AMark wholly unsecured for EB Capital's performance under the Chicago Promissory Note;

h.  Allowing the Chicago Property to be sold without notice to and the consent of AMark;

i.  Failing to ensure that the proceeds from the sale of the Chicago Property were tendered to AMark in repayment of the Chicago Promissory Note; and

j.  Failing to require EB Capital to maintain, preserve, and protect the Chicago Property for the benefit of AMark and all other lenders.

141.    As a proximate result of EB Finance's breach as set forth herein, as well as those breaches that are detailed in the Factual Background section of this Complaint and incorporated herein by reference, AMark has suffered damages in the form of economic loss and consequential damages in an amount to be determined by the finder of fact but not to exceed $1,000,000.00 (excluding punitive damages and attorney's fees), for which AMark now seeks recovery from EB Finance.

### COUNT 8: MONEY HAD AND RECEIVED – EB CAPITAL

142.    AMark incorporates herein all prior and subsequent allegations in this pleading as though fully set forth herein.

143.    AMark is entitled to recover damages against EB Capital under the equitable theory of money had and received. EB Capital holds money that was tendered to it, both from AMark and from the purchaser of the Chicago Property. This money was not used for its intended purposes and was procured through fraud. Accordingly, the money, in equity and good conscience, belongs to AMark. As a result, AMark has suffered damages in the form of economic loss and consequential damages in an amount to be determined by the finder of fact but not to exceed $1,000,000.00 (excluding punitive damages and attorney's fees), for which AMark now seeks recovery from EB Capital.

### COUNT 9: BREACH OF FIDUCIARY DUTY – HARD MONEY

144.    AMark incorporates herein all prior and subsequent allegations in this pleading as though fully set forth herein.

145.    AMark is entitled to recover judgment from Hard Money under a cause of action for breach of fiduciary duty based upon Hard Money acting as an agent for AMark, therefore creating an agency-principal relationship, which in turn establishes a fiduciary duty owed by Hard

Money to AMark as a matter of law. Specifically, Hard Money owed the following fiduciary duties to AMark:

    a.      The duty of loyalty and utmost good faith

    b.      The duty of candor;

    c.      The duty to refrain from self-dealing;

    d.      The duty to act with integrity of the strictest kind;

    e.      The duty of fair, honest dealing; and

    f.      The duty of full disclosure.

146.    Hard Money breached its duty of loyalty and utmost good faith and engaged in self-dealing transactions, acting in the best interest of its owner, EB Capital, and against the interest of its principal, AMark, by committing this misconduct (or failing to act) as detailed throughout this Complaint, including, but not limited to:

    a.      Entering into a self-dealing transaction without full disclosure that Hard Money is wholly owned by EB Capital;

    b.      Failing to ensure that EB Capital used the funds loaned pursuant to the Houston Promissory Note exclusively for benefit of purchasing and developing the Houston Property, as was represented to AMark before the funds were advanced;

    c.      Failing to ensure that EB Capital properly maintained the Houston Property in order to protect the collateral securing AMark's right to repayment under the Houston Promissory Note;

---

d.      Failing to ensure that no other liens would be placed on the Houston Property in order to protect the collateral securing AMark's right to repayment under the Houston Promissory Note;

e.      Failing to ensure that the property taxes for the Houston Property would be paid in order to protect the collateral securing AMark's right to repayment under the Houston Promissory Note;

f.      Unilaterally extending the term of the Houston Promissory Note without notice to and the consent of AMark;

g.      Failing to declare EB Capital in default when EB Capital failed to timely make the payments due and owing under the under the Houston Promissory Note in accordance with its terms and pursuant to the express direction of AMark; and

h.      Failing to foreclose on the Houston Property when EB Capital failed to timely make the payments due and owing under the under the Houston Promissory Note in accordance with its terms and pursuant to the express direction of AMark.

i.      Unilaterally releasing the Chicago Security Interest without notice to and the consent of AMark, leaving AMark wholly unsecured for EB Capital's performance under the Chicago Promissory Note; and

j.      Allowing the Chicago Property to be sold without notice to and the consent of AMark.

147.     Hard Money also breached its duty of candor, duty to act with integrity of the strictest kind, duty of fair, honest dealing; and duty of full disclosure by committing this misconduct (or failing to act) as detailed throughout this Complaint, including, but not limited to:

a.     Failing to disclose, prior to AMark lending the funds at issue, that Hard Money (agent and servicer for AMark for the Houston Promissory Note) is wholly owned by EB Capital (the borrower for the Houston Promissory Note);

b.     Failing to disclose, prior to AMark lending the funds at issue, that an issue with G-Slow was allegedly impacting the financial stability of EB Capital and allegedly threatening its future viability as a borrower for the Houston Promissory Note; and

c.     Affirmatively misrepresenting the status of EB Capital, Hard Money, EB Finance, and its principals as financially strong and savvy real estate investors, despite having knowledge of G-Slow's alleged misconduct and the prior bankruptcies of both Jerry H. Cohen and Shaun D. Cohen.

148.     Hard Money's breach of these fiduciary duties proximately caused damages to AMark, compromising substantial sums of money entrusted to the Original Defendants, and resulted in significant benefit to the Original Defendants and their related businesses. AMark relied on Hard Money's position as a fiduciary agent to AMark's detriment and has suffered actual damages as a proximate result of Hard Money's breaches of fiduciary duty in the form of economic loss and consequential damages in an amount to be determined by the finder of fact but not to exceed $1,000,000.00 (excluding punitive damages and attorney's fees), for which AMark now seeks recovery from Hard Money.

149.    Hard Money's conduct as set forth herein, as well as the conduct detailed in the Factual Background section of this Complaint and incorporated herein by reference, was committed with actual malice and specific intent to harm AMark. Hard Money's conduct was unjustified, likely to cause serious harm to AMark, and involved an extreme degree of risk considering the probability and magnitude of potential harm to AMark. Hard Money sought to gain an additional, unwarranted benefit in behalf of the Original Defendants at AMark's expense. As such, AMark also seeks recovery of exemplary damages from Hard Money.

### COUNT 10: BREACH OF FIDUCIARY DUTY – EB FINANCE

150.    AMark incorporates herein all prior and subsequent allegations in this pleading as though fully set forth herein.

151.    AMark is entitled to recover judgment from EB Finance under a cause of action for breach of fiduciary duty based upon EB Finance acting as an agent for AMark, therefore creating an agency-principal relationship, which in turn establishes a fiduciary duty owed by EB Finance to AMark as a matter of law. Specifically, EB Finance owed the following fiduciary duties to AMark:

a.    The duty of loyalty and utmost good faith

b.    The duty of candor;

c.    The duty to refrain from self-dealing;

d.    The duty to act with integrity of the strictest kind;

e.    The duty of fair, honest dealing; and

f.    The duty of full disclosure.

152.    EB Finance breached its duty of loyalty and utmost good faith and engaged in self-dealing transactions, acting in the best interest of its owner, EB Capital, and against the interest of

its principal, AMark, by committing this misconduct (or failing to act) as detailed throughout this Complaint, including, but not limited to:

a.   Entering into a self-dealing transaction without full disclosure that EB Finance is wholly owned by EB Capital;

b.   Failing to ensure that EB Capital used the funds loaned pursuant to the Chicago Promissory Note exclusively for benefit of purchasing and developing the Chicago Property, as was represented to AMark before the funds were advanced;

c.   Failing to ensure that no other liens would be placed on the Chicago Property in order to protect the collateral securing AMark's right to repayment under the Chicago Promissory Note;

d.   Failing to ensure that the property taxes for the Chicago Property would be paid in order to protect the collateral securing AMark's right to repayment under the Chicago Promissory Note;

e.   Unilaterally extending the term of the Chicago Promissory Note without notice to and the consent of AMark;

f.   Failing to declare EB Capital in default when EB Capital failed to timely make the payments due and owing under the under the Chicago Promissory Note in accordance with its terms and pursuant to the express direction of AMark; and

g.   Failing to foreclose on the Chicago Property when EB Capital failed to timely make the payments due and owing under the under the Chicago

Promissory Note in accordance with its terms and pursuant to the express direction of AMark.

153.    EB Finance also breached its duty of candor, duty to act with integrity of the strictest kind, duty of fair, honest dealing; and duty of full disclosure by committing this misconduct (or failing to act) as detailed throughout this Complaint, including, but not limited to:

    a.    Failing to disclose, prior to AMark lending the funds at issue, that EB Finance (agent and servicer for AMark for the Chicago Promissory Note) is wholly owned by EB Capital (the borrower for the Chicago Promissory Note);

    b.    Failing to disclose, prior to AMark lending the funds at issue, that an issue with G-Slow was allegedly impacting the financial stability of EB Capital and allegedly threatening its future viability as a borrower for the Chicago Promissory Note; and

    c.    Affirmatively misrepresenting the status of EB Capital, EB Finance, EB Finance, and its principals as financially strong and savvy real estate investors, despite having knowledge of G-Slow's alleged misconduct and the prior bankruptcies of both Jerry H. Cohen and Shaun D. Cohen.

154.    EB Finance's breach of these fiduciary duties proximately caused damages to AMark, compromising substantial sums of money entrusted to the Original Defendants, and resulted in significant benefit to the Original Defendants and their related businesses. AMark relied on EB Finance's position as a fiduciary agent to AMark's detriment and has suffered actual damages as a proximate result of EB Finance's breaches of fiduciary duty in the form of economic loss and consequential damages in an amount to be determined by the finder of fact but not to

exceed $1,000,000.00 (excluding punitive damages and attorney's fees), for which AMark now seeks recovery from EB Finance.

155.     EB Finance's conduct as set forth herein, as well as the conduct detailed in the Factual Background section of this Complaint and incorporated herein by reference, was committed with actual malice and specific intent to harm AMark. EB Finance's conduct was unjustified, likely to cause serious harm to AMark, and involved an extreme degree of risk considering the probability and magnitude of potential harm to AMark. EB Finance sought to gain an additional, unwarranted benefit in behalf of the Original Defendants at AMark's expense. As such, AMark also seeks recovery of exemplary damages from EB Finance.

156.     EB Finance's conduct as set forth herein, as well as the conduct detailed in the Factual Background section of this Complaint and incorporated herein by reference, was committed with actual malice and specific intent to harm AMark. EB Finance's conduct was unjustified, likely to cause serious harm to AMark, and involved an extreme degree of risk considering the probability and magnitude of potential harm to AMark. EB Finance sought to gain an additional, unwarranted benefit in behalf of the Original Defendants at AMark's expense. As such, AMark also seeks recovery of exemplary damages from EB Finance.

### COUNT 11: BREACH OF FIDUCIARY DUTY – JERRY H. COHEN & SHAUN D. COHEN

157.     AMark incorporates herein all prior and subsequent allegations in this pleading as though fully set forth herein.

158.     AMark is entitled to recover judgment from Jerry H. Cohen and Shaun D. Cohen under a cause of action for breach of fiduciary duty. Specifically, both Jerry H. Cohen and Shaun D. Cohen owed fiduciary duties to AMark. The fraudulent actions and omissions of Jerry H. Cohen and Shaun D. Cohen, as set forth in in Count 4 above, also constitute a breach of the following

fiduciary duties owed to AMark: the duty of loyalty and utmost good faith, the duty of candor, the duty to refrain from self-dealing, the duty to act with integrity of the strictest kind, the duty of fair, honest dealing, and the duty of full disclosure.

159.    Additionally, Jerry H. Cohen, as the owner of Hard Money and EB Finance, and Shaun D. Cohen, as the corporate officer of Hard Money and EB Finance, are both liable for each of the breaches of fiduciary duties they committed on behalf of Hard Money and EB Finance, as set forth in Counts 9 and 10 above. The actions or omissions set forth therein were committed solely by, or at the direction of, both Jerry H. Cohen and Shaun D. Cohen, who each knowingly participated in the wrongdoing. As Such, Jerry H. Cohen and Shaun D. Cohen are also individually liable for the tortious fraudulent conduct of EB Capital, Hard Money, and EB Finance as a matter of law.

160.    Jerry H. Cohen and Shaun D. Cohen's breach of these duties caused damages to AMark, compromising substantial sums of money entrusted to the Original Defendants, and resulted in significant benefit to the Original Defendants and their related businesses. AMark relied on Jerry H. Cohen and Shaun D. Cohen's positions as fiduciary agents to AMark's detriment and has suffered actual damages as a proximate result in the form of economic loss and consequential damages in an amount to be determined by the finder of fact but not to exceed $1,000,000.00 (excluding punitive damages and attorney's fees), for which AMark now seeks recovery jointly and severally from Jerry H. Cohen and Shaun D. Cohen.

161.    Jerry H. Cohen and Shaun D. Cohen's conduct as set forth herein, as well as the conduct detailed in the Factual Back`ground section of this Complaint and incorporated herein by reference, was committed with actual malice and specific intent to harm AMark. Jerry H. Cohen and Shaun D. Cohen's conduct was unjustified, likely to cause serious harm to AMark, and

involved an extreme degree of risk considering the probability and magnitude of potential harm to AMark. Jerry H. Cohen and Shaun D. Cohen sought to gain an additional, unwarranted benefit in behalf of the Original Defendants at AMark's expense. As such, AMark also seeks recovery of exemplary damages from Jerry H. Cohen and Shaun D. Cohen.

### COUNT 12: FRAUDULENT TRANSFER – ALL DEFENDANTS

162.   AMark incorporates herein all prior and subsequent allegations in this pleading as though fully set forth herein.

163.   Defendants' conduct, as set forth herein, constitutes numerous fraudulent transfers under the Texas Uniform Fraudulent Transfer Act, as set forth in TEX. BUS. & COM. CODE § 24.001, *et seq.* With notice of the debt owed to AMark, EB Capital transferred the properties listed in Column B of the Chart (the "Transferred Properties") by and through the efforts of all of the Original Defendants with intent to hinder, delay and defraud AMark in violation of TEX. BUS. & COM. CODE § 24.005–.006. As a result of the fraudulent transfer undertaken by Defendants, AMark has suffered damages resulting from the loss of and deprivation of EB Capital assets which would have been available to AMark for the partial or complete satisfaction of EB Capital's debts to AMark arising from the Houston Promissory Note and the Chicago Promissory Note.

164.   Pursuant to TEX. BUS. & COM. CODE § 24.008, AMark respectfully requests that the Court enter a judgment for avoidance of the fraudulent transfers of the Transferred Properties. Alternatively, pursuant to TEX. BUS. & COM. CODE § 24.009, AMark respectfully requests that the Transferee Entities be held liable for EB Capital's debt obligations to AMark in an amount up to the value of the properties transferred. Additionally, AMark respectfully requests that the Court issue an order allowing AMark to levy execution on the Transferred Properties or the proceeds therefrom in satisfaction of the debt owed to AMark.

### COUNT 13: VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ("RICO") ACT – ALL DEFENDANTS

165.    AMark incorporates herein all prior and subsequent allegations in this pleading as though fully set forth herein.

166.    Defendants' conduct as set forth herein violates the federal RICO statute, as set forth in 18 U.S.C. § 1961 *et seq.* Specifically, Defendants Hard Money obtained money from AMark through "racketeering activity," as defined in the statute, and purported to lend, but actually misappropriated, AMark's money through an enterprise comprised of all Defendants illegally operating for the benefit of Jerry H. Cohen and Shaun D. Cohen. The enterprise affected interstate commerce and proximately caused an injury resulting from the misappropriation of racketeering income distinct from an injury caused by the predicate acts themselves. Consequently, AMark seeks recovery from Defendants under the federal RICO statute in the form of economic loss and consequential damages in an amount to be determined by the finder of fact but not to exceed $1,000,000.00 (excluding punitive damages and attorney's fees), as well as an award of treble damages as provided thereunder.

### COUNT 14: AIDING AND ABETTING – TRANSFEREE ENTITIES

167.    AMark incorporates herein all prior and subsequent allegations in this pleading as though fully set forth herein.

168.    As set forth in Counts 1 through 4, and 8 through 12, the Original Defendants committed numerous torts against AMark. The Transferee Entities are imputed with the knowledge of their principals—Jerry H. Cohen and Shaun D. Cohen—were fully aware of the tortious acts being committed. Despite that knowledge, and indeed because of it, the Transferee Entities, with the unlawful intent of receiving fraudulently concealed assets, gave substantial assistance and encouragement to the Original Defendants in committing the tortious acts complained of herein.

As a result of this assistance and encouragement, AMark has suffered damages in the form of economic loss and consequential damages in an amount to be determined by the finder of fact but not to exceed $1,000,000.00 (excluding punitive damages and attorney's fees), for which AMark now seeks recovery from the Transferee Entities jointly and severally.

### COUNT 15: AIDING AND ABETTING – JERRY H. COHEN & SHAUN D. COHEN

169.     AMark incorporates herein all prior and subsequent allegations in this pleading as though fully set forth herein.

170.     As set forth in Counts 1 through 3, 8 through 10, and 12, EB Capital, Hard Money, and EB Finance committed numerous torts against AMark. Jerry H. Cohen and Shaun D. Cohen were fully aware of the tortious acts being committed, and in fact all such tortious acts were either committed by and through Jerry H. Cohen and Shaun D. Cohen directly or under their direct instruction and supervision. Despite that knowledge, and indeed because of it, Jerry H. Cohen and Shaun D. Cohen, with the unlawful intent of receiving fraudulently concealed assets, gave substantial assistance and encouragement to EB Capital, Hard Money, and EB Finance in committing the tortious acts complained of herein. As a result of this assistance and encouragement, AMark has suffered damages in the form of economic loss and consequential damages in an amount to be determined by the finder of fact but not to exceed $1,000,000.00 (excluding punitive damages and attorney's fees), for which AMark now seeks recovery from the Jerry H. Cohen and Shaun D. Cohen jointly and severally.

### COUNT 16: CONSPIRACY – ALL DEFENDANTS

171.     AMark incorporates herein all prior and subsequent allegations in this pleading as though fully set forth herein.

172.     AMark is entitled to recover damages from each Defendant, jointly and severally,

for the actions of each other Defendant because Defendants acted in conspiracy to defraud and damage AMark. Defendants are a combination of two or more persons and entities, the object of the combination was the carrying out of the unlawful actions described above, Defendants had a meeting of the minds on the course of action, and each of Defendants committed unlawful acts described above. As a result of these unlawful acts, AMark has suffered damages in the form of economic loss and consequential damages in an amount to be determined by the finder of fact but not to exceed $1,000,000.00 (excluding punitive damages and attorney's fees), for which AMark now seeks recovery from all Defendants jointly and severally.

## V. ADDITIONAL REMEDIES SOUGHT

173.    In addition to monetary damages as pleaded herein, AMark seeks the following relief and remedies. To specifically address the Original Defendants' arguments contained in their Motion to Dismiss pursuant to FED. R. CIV. P. 12(b)(6), the following are pleaded as remedies. However, to the extent that the Original Defendants subsequently change course and contend that any of the following are required to be pleaded as independent causes of action, AMark hereby incorporates them by reference and pleads them as causes of action accordingly.

### REMEDY 1: NOTICE OF CONFESSION OF JUDGMENT

174.    AMark incorporates herein all prior and subsequent allegations in this pleading as though fully set forth herein.

175.    Pursuant to Paragraph 18 of the Chicago Promissory Note, the Chicago Promissory Note is governed by the laws of the State of Illinois, a state which bears a reasonable relationship to the parties and transaction because it is the state in which the Chicago Property is located. Paragraph 8 of the Chicago Promissory Note, which was drafted exclusively by the Original Defendants without any input or participation by AMark, contains a confession of judgment, which

is fully valid and enforceable under Illinois law. Moreover, due to the cross-default and remedy provisions contained throughout the Chicago Promissory Note, AMark was fully entitled to hire an attorney on behalf of EB Capital and enter a confession of judgment against it. While AMark has elected not to pursue the bold procedure contained in the Chicago Promissory Note of hiring an attorney on its behalf in an abundance of caution, notice is hereby given that AMark will seek to enforce this provision and have the Court enter a confession of judgment against EB Capital for the full amount due and owing plus attorney's fees.

## REMEDY 2: CONSTRUCTIVE TRUST

176.    AMark incorporates herein all prior and subsequent allegations in this pleading as though fully set forth herein.

177.    Due to Jerry H. Cohen and Shaun D. Cohen's, and by effect, their co-conspirators' fraud and breaches of fiduciary duty, AMark is entitled to the imposition of a constructive trust on the proceeds, funds and property obtained by the Original Defendants as a result of their fraud and breaches of fiduciary duty. This constructive trust should include, at a minimum, all monies held by any of the Original Defendants, as well as the proceeds therefrom, as may be uncovered through the course of this suit. Said constructive trust shall be for the benefit of AMark and the contents thereof liquidated and paid over to AMark in an amount equal to AMark's damages of $631,855.64 as of March 1, 2018, together with interest, court costs, and attorney's fees incurred by AMark.

## REMEDY 3: FORECLOSURE OF INTEREST IN REAL PROPERTY

178.    AMark incorporates herein all prior and subsequent allegations in this pleading as though fully set forth herein.

179.    Based upon EB Capital's default under the terms of the Houston Promissory Note and the Chicago Promissory Note, AMark's interest in the Houston Property has become a present

and enforceable interest subject to foreclosure. AMark accordingly seeks to foreclose upon its interest, take ownership of the Houston Property, and sell the Houston Property to satisfy the Houston Promissory Note and the Chicago Promissory Note.

### REMEDY 4: ATTORNEY'S FEES

180.    AMark incorporates herein all prior and subsequent allegations in this pleading as though fully set forth herein.

181.    Due to Defendants' actions, AMark has been forced to retain the undersigned attorney to represent it in this action and has agreed to pay reasonable and necessary attorneys' fees. An award of reasonable and necessary attorneys' fees to AMark would be equitable and just, and is authorized by the terms of both the Houston Promissory Note and the Chicago Promissory Note, as well as TEX. CIV. PRAC. & REM. CODE § 38.001 *et. seq*. and TEX. BUS. & COM. CODE § 24.001 *et. seq.* Pursuant to Paragraph 6 of the Chicago Promissory Note, said recovered attorney's shall be in the minimum amount of fifteen percent (15%) of the amount of the judgment.

### REMEDY 5: INJUNCTIVE RELIEF

182.    AMark incorporates herein all prior and subsequent allegations in this pleading as though fully set forth herein.

183.    AMark requests that the Court permanently enjoin Defendants (or anyone acting on their behalf or at their direction) and order them to:

a.      Refrain from transferring any real property currently owned or held by any of the Defendants unless subsequently ordered otherwise by this Court;

b.      Refrain from releasing any mortgage or deed of trust on any real property currently owned or held by any of the Defendants unless subsequently ordered otherwise by this Court;

c.     Refrain from borrowing against, pledging, or in any way otherwise encumbering any real property currently owned or held by any of the Defendants unless subsequently ordered otherwise by this Court.

184.     To effectuate the above-referenced relief, AMark respectfully requests that the Court enter a Temporary Injunction, enjoining Defendants as set forth above, pending the Court's final resolution regarding the merits of the final relief sought by AMark. The relief sought is within the Court's power and is necessary as a matter of both law and equity to maintain the *status quo* and protect AMark from irreparable injury.

### REMEDY 6: REPLACEMENT OF HARD MONEY AND EB FINANCE

185.     AMark incorporates herein all prior and subsequent allegations in this pleading as though fully set forth herein.

186.     As a result of Defendants' actions set forth throughout this Complaint, which occurred with consent and participation of Hard Money and EB Finance, it is clear that Hard Money and EB Finance are not capable of acting as AMark's agent and fiduciary without engaging in self-dealing and fraud. Accordingly, AMark requests that this Court enter an order replacing Hard Money and EB Finance as the servicers of the Houston Promissory Note and the Chicago Promissory Note, respectively.[50] AMark is ready and willing to serve as the replacement servicer, but also consents to a disinterested third-party being appointed by the Court.

---

[50] Alternatively, AMark has the contractual ability, either alone or alongside other lenders, to remove Hard Money and EB Finance as the servicers under the Houston Promissory Note and the Chicago Promissory Note, respectively. To do so, AMark, and any other lender that is necessary to effectuate this removal, must be acting as a majority of the outstanding principal of each of the loans. AMark is not aware, at this time, if its loaned funds alone constitute a majority of the outstanding principal of each of the loans, which will be a topic explored in discovery.

## VI.  PRAYER

WHEREFORE, PREMISES CONSIDERED, AMark prays that Defendants be cited to appear and answer herein; that upon final hearing hereof, AMark have judgment against Defendants awarding the following relief:

1.  Actual economic damages in the amount of $631,855.64;

2.  Exemplary damages as provided by law;

3.  Avoidance of the fraudulent transfers set forth herein, along with an order allowing AMark to levy execution on the Transferred Properties or the proceeds therefrom in satisfaction of the debt owed to AMark;

4.  Imposition of a constructive trust on the proceeds, funds and property obtained by the Original Defendants as a result of their fraud and breaches of fiduciary duty;

5.  Foreclosure on AMark's interest in the Houston Property;

6.  Injunctive relief ordering Defendants (or anyone acting on their behalf or at their direction) to:

    a.  Refrain from transferring any real property currently owned or held by any of the Defendants unless subsequently ordered otherwise by this Court;

    b.  Refrain from releasing any mortgage or deed of trust on any real property currently owned or held by any of the Defendants unless subsequently ordered otherwise by this Court;

    c.  Refrain from borrowing against, pledging, or in any way otherwise encumbering any real property currently owned or held by any of the Defendants unless subsequently ordered otherwise by this Court.

7.      AMark's reasonable and necessary attorney's fees incurred in the prosecution of this case;

8.      Pre-judgment interest per annum from March 1, 2018 until date of judgment; and

9.      Costs of Court, post-judgment interest as provided by law, and any such other relief, special or general, at law or in equity to which AMark may show himself justly entitled.

**Respectfully submitted,**

PADFIELD & STOUT, L.L.P.
421 W. Third Street, Suite 910
Fort Worth, Texas 76102
(817) 338-1616


 /s/ Matthew B. Fronda
Alan B. Padfield
State Bar I.D. #00784712
abp@padfieldstout.com
George A. Pence
State Bar I.D. #00798424
gap@pencelawfirm.com
Matthew B. Fronda
State Bar I.D. #24086264
mfronda@padfieldstout.com

*Attorneys for Plaintiff*


### CERTIFICATE OF SERVICE

This is to certify that on June 12, 2018, I forwarded a true and correct copy of the foregoing First Amended Complaint to the Original Defendants, by and through their attorney of record, Jason D. Kraus, by e-service and/or email.

/s/ Alan B. Padfield
Alan B. Padfield

---